697 A.2d 898

JBG/TWINBROOK METRO LIMITED PARTNERSHIP

v.

Bobby Joe WHEELER et al.

No. 80, Sept. Term, 1996.

Court of Appeals of Maryland.

Aug. 6, 1997.

Reconsideration Denied Sept. 15, 1997.

**602**

Brian Koukoutchos, Bedford, MA (Roger W. Titus, Richard H. Mays, Thomas M. Lingan, Venable, Baetjer and Howard, L.L.P., on brief), Rockville, for appellant.

William J. Stack (Exxon Co., Debra S. Rosen, Archer & Greiner, Haddonfield, NJ, Michael Skojec, Matthew W. Oakey, Gallagher, Evelius & Jones, Baltimore, on brief), E. Charles Dann, Jr. (Goodell, DeVries, Leech & Gray, L.L.P., on brief), Baltimore, Alan D. Rothenberg, Rockville, on brief, for appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

RODOWSKY, Judge.

The plaintiff in this case appeals from a judgment on a jury verdict in favor of the defendants in an action for damages based on the subsurface percolation of gasoline into plaintiff's land from a gasoline service station on adjacent land. The issues concern the construction of Maryland Code (1982, 1996 Repl.Vol.), § 4–409(a) of the Environment Article (Env.), the applicability of assumption of the risk to what the parties have treated as a claim of trespass *quare clausum fregit*, and the sufficiency of the plaintiff's evidence to establish liability for trespass on the part of two oil companies which at different times sold gasoline to the service station owner and operator.

Bobby Joe Wheeler (Wheeler), one of the defendants below, owns and operates the service station. For five or more years prior to 1982 the station dispensed Gulf brand gasoline, the product of Gulf Oil Corporation, a predecessor of the defendant Chevron U.S.A. Inc. (Chevron).[1] Since 1990 Wheeler has sold Exxon brand gasoline, the product of the defendant, Exxon Company, U.S.A. (Exxon).

The station is located in Montgomery County at 1901 Rockville Pike, on the southeast corner of Rockville Pike and

---

1. In this opinion we shall refer only to Chevron without distinguishing between it and the entity which it succeeded.

Thompson Avenue.[2] The station fronts approximately 150 feet on Rockville Pike and extends to the east approximately 165 feet along the south side of Thompson Avenue. The underground storage tanks (USTs) are in the southwest quarter of the service station property, the nearest approximately eighty-eight feet from the eastern border of the station.

The eastern boundary of the station abuts the western boundary of a parcel extending along the south side of Thompson Avenue to Chapman Avenue and known as 1901 Chapman Avenue. This property is owned by the plaintiff, JBG/Twinbrook Metro Limited Partnership (JBG), and it is improved by a three-story masonry office building with basement built in 1960. The office building sits on the southerly half of the property at 1901 Chapman Avenue, with the building's west wall approximately 100 feet from the boundary with the gasoline station. An embankment along the property line slopes down from the gas station elevation to an asphalt paved parking lot (the West Lot) that lies between the foot of the embankment and a walkway in front of the entrance located on the west side of the office building. Another asphalt paved parking lot on 1901 Chapman Avenue lies between the north side of the office building and Thompson Avenue (the North Lot). A single entrance/exit serves both lots on Thompson Avenue.

Gasoline floats on water, and subsurface, free phase gasoline can float on underground water and be carried in the direction of the water flow. The generalized ground water flow for the two properties is from southwest to northeast, that is, from the USTs in the southwest corner of the gas station to its northeast corner which abuts the northwest corner of 1901 Chapman Avenue.

Chevron originally developed the Rockville Pike property as a service station, leased it to Wheeler in 1976, and sold it to

---

**2.** Rockville Pike runs in a northwesterly-southeasterly direction and Thompson Avenue runs in a northeasterly-southwesterly direction. Throughout this opinion we present compass directions by moving true north forty-five degrees northwest.

Wheeler in September 1978. Included in the sale were the then existing USTs. Sometime in 1978 or 1979 the station manager discovered a hole in one of the USTs, and the hole was subsequently patched. Chevron continued to supply Wheeler with gasoline through 1981.

From 1982 until 1990 Wheeler operated the service station independently of any affiliation with an oil company, purchasing gasoline from independent distributors. In September 1990 Wheeler entered into an agreement with Exxon under which Wheeler agreed to sell Exxon products exclusively for ten years in consideration of Exxon's paying $488,300 for remodeling the station and installing new USTs and dispensers.

Two months later, when the old USTs were unearthed and removed, under the supervision of the Maryland State Department of Environment (MDE), two of the old tanks were found to contain holes.[3] MDE ordered Wheeler to remove approximately 1,600 tons of contaminated soil from his property and to install monitoring wells (MWs) to determine whether any gasoline had migrated from the tank site. In January 1991 readings from these wells indicated that gasoline had migrated throughout the service station property. At the direction of MDE, Wheeler installed additional wells on his property and, with the permission of the then adjoining property owner, Equitable Life Assurance Society (Equitable), placed wells on 1901 Chapman Avenue. Wheeler also began removing free phase gasoline from the subsurface of the service station property.

After undertaking a preliminary investigation, JBG, on February 8, 1991, entered into a contract with Equitable to purchase for $28.5 million a portfolio of investment properties in the Twinbrook Metro area of Montgomery County that included 1901 Chapman Avenue. Under the contract JBG had sixty days to complete a due diligence analysis.

---

**3.** New double-walled USTs which contained modern turbine pumps with leak detectors and a "total containment system" were installed. The new USTs became operative in December 1990.

JBG hired Hygienetics Inc. (Hygienetics) to perform an environmental analysis of all of the properties. An initial report of March 27, 1991, identified 1901 Chapman Avenue as having the potential for an on-site contamination from off-site sources. On April 5, 1991, Hygienetics then reported "the discovery of free phase gasoline at the 1901 Chapman Avenue site." This second report states that "[a]t least 6.5 feet of gasoline has been confirmed to exist in monitoring well MW–5" and that the contamination is "believed [to be] a direct result of a release [of gasoline] from a UST at the adjacent Rockville Service Center Exxon." [4]

A third report prepared by Hygienetics and submitted to Equitable on April 10, 1991, identified "[t]he existence of approximately two feet of free product at MWW–7." [5] This report indicated that "the current recovery operation is inadequate . . ." and observed that "[t]he existence of free product in MWW–7 suggests that the plume [of free phase gasoline] may be approaching the building foundation."

Within the first two weeks of MDE's having ordered remediation, approximately 500 gallons of free phase, subsurface gasoline were recovered by use of a product skimmer from a well on the station site. Wheeler's employees hand-bailed a few hundred additional gallons.

Wheeler also installed a remediation system that recovered free phase gasoline and contaminated ground water from a well located at the Thompson Avenue entrance of 1901 Chapman Avenue. From there the liquids were pumped to a facility erected in the northeast corner of Wheeler's property where the gasoline was separated and the water treated. By

---

**4.** The well referred to and then called MW–5 was located in the northwest corner of 1901 Chapman Avenue on the West Lot. The well was approximately 4.25 inches in diameter and was drilled to a depth of forty feet.

**5.** MWW–7, eight inches in diameter and dug to a depth of forty-five feet, was located on the West Lot of 1901 Chapman Avenue, about twenty-four feet east of the Exxon station property line and approximately midway between the north and south property lines of 1901 Chapman Avenue.

April 1991 approximately seventy-five gallons of gasoline had been recovered through this system.

JBG expressed its concern to Equitable over the inclusion of 1901 Chapman Avenue in the properties to be purchased. Equitable then obtained from MDE an estimate of $150,000 as the total cost of the corrective work, apparently on both the Exxon station and the office building sites. MDE had ordered Wheeler to pay for the corrective work. By letter of April 10, 1991, to JBG, Equitable proposed the following indemnification: "In the unlikely event that the service station fails to pay for the corrective action, and the State goes after JBG for this cost, Equitable will pay for the direct cost of state required correction/clean-up not to exceed $150,000." JBG accepted the indemnity approach to their concern, agreed upon a more specifically drafted indemnification, and took title to 1901 Chapman Avenue by a deed dated April 16, 1991. The representative of JBG's management testified that management believed at the time of closing that the contamination was confined to the northwest corner of the West Lot, away from the office building, and that the contamination would be removed.

After JBG took title the monitoring wells on its property were relatively free of contamination. In the spring of 1992, however, the amount of free phase gasoline on the station site was found to be increasing, elevating the risk that the plume would enlarge on the plaintiff's property. In order to determine if this were so, MW–12 was sunk on the West Lot, approximately thirty feet from the northwest corner of the office building, and MW–13 was sunk near the west end of the North Lot. On July 8, 1992, there was approximately one-half inch of free gasoline in MW–12, and on July 28, 1992, there were five inches of free floating product in that well. Also on July 8, over three feet of free product was found in MW–15 located in the northwest portion of the West Lot.

Eventually twelve monitoring wells were dug in the Chapman site, nine in the service station site, and two others on the opposite side of Thompson Avenue from the two properties.

There was evidence that by the first quarter of 1993 the plume of underground gasoline, extending in a southwesterly-northeasterly direction from the UST area of the station lot, had spread throughout most of the service station, approximately one-half of the West Lot on 1901 Chapman Avenue, and the northwest corner of the North Lot. Because of the odor of gasoline on the West Lot, JBG installed a vapor alarm and ventilation system in the basement of its building and imposed a no smoking ban on the parking lots. By December 1992 MDE assumed primary responsibility for the cleanup of both properties. There was evidence that the plume gradually shrank so that by November 1995 the free floating product was confined to a relatively small area immediately adjacent to the USTs on the station site.

JBG instituted the instant action in August 1992. The plaintiff's third amended complaint alleged that Wheeler, Chevron, and Exxon were liable, based on a statutory cause of action under Env. § 4-409(a) and on common law claims of trespass, negligence, nuisance, and strict liability. Summary judgment was granted in favor of the defendants on the strict liability claim,[6] and JBG does not contest that ruling on this appeal. After twelve days of testimony before a jury the circuit court submitted the case on special interrogatories that permitted the jury to consider separately each of the four remaining theories of liability. In addition, and over JBG's objection, the court submitted to the jury the issue of whether the plaintiff had assumed the risk of loss and injury as to all theories of liability other than nuisance. The jury found that all defendants-appellees had violated Env. § 4-409(a) and had trespassed on the plaintiff's property but that no defendant had been negligent or committed a nuisance. The jury fur-

---

6. The south side of the Exxon station is very near the intersection of Rockville Pike and Twinbrook Parkway. There are gasoline service stations respectively on the northwest, southwest, and southeast corners of that intersection. *Compare Yommer v. McKenzie,* 255 Md. 220, 257 A.2d 138 (1969) (applying strict liability rule of *Rylands v. Fletcher,* L.R. 1 Ex. 265 (1866), aff'd, L.R. 3 H.L. 30 (1868), to storage of large quantities of gasoline immediately adjacent to private residence).

ther found that the plaintiff had "voluntarily assumed the risk of contamination with full knowledge and understanding at the time it purchased the 1901 Chapman property." Based on the jury verdict the circuit court entered judgment in favor of all defendants, *i.e.*, the circuit court held that assumption of the risk was an absolute defense to the § 4–409(a) cause of action and to trespass.

JBG appealed to the Court of Special Appeals, and this Court granted certiorari on its own motion prior to consideration of the matter by the Court of Special Appeals. Here, JBG contends that the circuit court erred in submitting assumption of the risk to the jury on the statutory and trespass claims. Wheeler, Chevron, and Exxon all contend that assumption of the risk is available as to both claims. In addition, Chevron and Exxon contend that, even if assumption of the risk is not a defense, JBG's evidence is legally insufficient to establish liability against those defendants.

## I

In this Part I we consider the count asserting the statutory cause of action. Env. § 4–409(a) reads:

"The person responsible for the oil spillage shall be liable to any other person for any damage to his real or personal property directly caused by the spillage." [7]

---

7. Env. § 4–409 also contains a subsection (b) which reads as follows:
   "(1) In this subsection, 'owner of an underground oil storage tank' includes any person who:
   (i) Causes an underground oil storage tank to be installed; or
   (ii) Acquires, other than through a lease or rental, and uses an underground oil storage tank.
   (2) The Department [of the Environment] shall adopt regulations requiring the owner of an underground oil storage tank to provide evidence of financial responsibility for costs of cleanup, corrective action, and third party liability in the event of a discharge.
   (3) Tanks subject to the financial responsibility requirements of this subsection shall be the same as those tanks for which financial assurance is required under Subtitle I of the Resource Conservation and Recovery Act, and limits of coverage shall be the same as those imposed under that act."
   We shall consider subsection (b), *infra*. ·

JBG argues that the above-quoted section imposes strict liability, or liability without regard to fault, with the result that an assumption of the risk defense is incompatible with the legislative purpose of the statute. The defendants contend that nothing in the statutory language abrogates ordinary defenses and that any such abrogation must be accomplished by specific language.

Section 4–409(a) is part of Env. Title 4, "Water Management," Subtitle 4, "Water Pollution Control and Abatement." JBG calls Subtitle 4 "a comprehensive statute addressing the problems created by oil pollution" and cites Env. § 4–410(a) as a flat prohibition against "the discharge of oil and other petroleum products into the waters of the state." Brief of Appellant at 6. "Waters of this State" is a defined term in Env. Title 4 and includes both surface and underground waters. Env. § 4–101.1(d)(1). Env. § 4–410(a) provides:

"Except in case of emergency imperiling life or property, unavoidable accident, collision, or stranding, or as authorized by a permit issued under § 9–323 of this article, it is unlawful for any person to discharge or permit the discharge of oil in any manner into or on waters of this State."

In Subtitle 4 "oil" is defined to include gasoline. Env. § 4–401(g)(1)(ix).

■ Thus, as the parties have argued the issue concerning assumption of the risk, the question is the construction of § 4–409(a). Examination of the legislative history of § 4–409(a) as an aid to construction reveals, however, that it does not apply to the facts of the instant matter; rather, "the spillage" referred to in the statute is spillage from a vessel, ship, or boat. Unfortunately, the legislative history is quite tangled, and the subject statutes became embroiled in a "turf battle" that raged between the Department of Natural Resources (DNR) and the Department of Health and Mental Hygiene (DHMH) prior to the creation of MDE. In our review we shall refer to § 4–409(a) and its antecedents as the "Private Remedy Section" and to § 4–410(a) and its antecedents as the "Prohibition."

The Prohibition was enacted by Chapter 239 of the Acts of 1949 and was codified in Maryland Code (1951) as Article 66C, "Natural Resources," § 40(a). It read:

"Except in case of an emergency imperiling life or property, or unavoidable accident, collision, or stranding, it shall be unlawful for any person to discharge or permit the discharge of oil in any manner into or upon the waters within the jurisdiction of the State of Maryland from any vessel, ship or boat of any kind."

Criminal penalties were provided for violations.[8] *Id.* § 40(b). There was no Private Remedy Section at that time. By Chapter 73 of the Acts of 1964, the Prohibition was recodified and renumbered as Md.Code (1957, 1964 Repl.Vol.), Article 96A, title, "Water Resources," subtitle, "Pollution Abatement," § 26.

*Wild v. State,* 201 Md. 73, 92 A.2d 759 (1952), was an appeal from a conviction for violation of the Prohibition, as quoted above. In *Wild,* "we assume[d], without deciding, that proof of *scienter* is necessary under this statute," *id.* at 77, 92 A.2d at 761, but held that the "evidence was legally sufficient to support a finding of actual knowledge . . . that oil was in the water alongside the ship, and presumably escaping from the ship, at least two hours before the cause was found and corrected." *Id.* at 78, 92 A.2d at 761–62.

The statutes relating to water pollution were further revised by Chapter 243 of the Acts of 1970. It recodified the Prohibition as Article 96A, § 29(a), without change. Chapter 243 also enacted new §§ 29A and 29B. Section 29A obliged the Maryland Port Authority (MPA) and DNR to develop a program for responding to "an emergency oil spillage," and § 29B provided that those agencies "shall charge and collect a compensatory fee from the person responsible for the oil spillage" to cover cleanup costs.

---

8. The criminal penalties for violation of the Prohibition were more severe than the criminal penalties for violations of regulations or orders of the regulating agency, then the Maryland Water Pollution Control Commission. *See* Md.Code (1951), Art. 66C, §§ 39 and 42.

The Private Remedy Section was enacted by Chapter 504 of the Acts of 1971. Chapter 504, *inter alia*, added new §§ 29AB and 29BC to then Article 96A. Section 29AB(a) required the posting of a bond based upon the gross tonnage of oil cargo on behalf of every vessel entering Maryland waters to discharge or receive a cargo of oil in excess of twenty-five barrels. Section 29AB(a) further provided that

"[i]f the [MPA] or the [DNR] determines that oil has been discharged or spilled into the waters of the State from the vessel, the bond shall be forfeited, to the extent of the costs incurred by the [MPA] or the [DNR] in eliminating the residue of the oil discharge or spillage . . . and to the extent of any otherwise uncollectible fines. . . ."

Section 29BC is the Private Remedy Section. Its language as enacted in 1971 ("The person responsible for the oil spillage shall be liable to any other person for any damages to his real or personal property directly caused by the spillage.") is for all practical purposes identical to the current statute in Env. § 4–409(a).

The 1971 context makes plain that the "oil spillage" referred to in the Private Remedy Section is a spillage or discharge from a vessel, ship, or boat. Such a spillage or discharge is the limited object of the Prohibition in then § 29(a), of the "emergency oil spillage" plan required by then § 29A, of the bond required by then § 29AB(a), and of the compensatory fee chargeable by MPA and DNR under then § 29B.[9]

---

9. Chapter 504 of the Acts of 1971 was introduced as House Bill 128 and referred to the Environmental Matters Committee. 1971 House Journal at 85 (Mar. 19, 1971). The committee reported the bill favorably with an amendment to § 29AB, the bond requirement. After the word "forfeited," in the sentence quoted in the text above, the committee added, "regardless of any attributed fault." *Id.* at 1040. As so amended the bill passed the House unanimously. *Id.* at 1251 (Mar. 24, 1971). In the Senate, H.B. 128 was referred to the Economic Affairs Committee. 1971 Senate Journal at 1012 (Mar. 25, 1971). The committee deleted the above-mentioned House amendment to H.B. 128, *id.* at 1910 (Apr. 8, 1971), and H.B. 128 unanimously passed the Senate with the House amendment deleted. *Id.* at 2014–15 (Apr. 9, 1971). The House concurred in the Senate deletion by a vote of 117 to 3. 1971 House Journal at 2523 (Apr. 10, 1971).

Also at the 1971 session the General Assembly enacted Chapter 651 which added new subsection (a–1) immediately following the Prohibition in then Article 96A, § 29(a). Subsection (a–1) imposed a reporting requirement on persons "actively or passively participating in the discharge or spilling of oil[ ] into the waters of the State either from a land-based installation ... or from any vessel, ship or boat of any kind." The existing criminal penalty provision, Art. 96A, § 29(b), was expanded to include violations of new subsection (a–1) in addition to the Prohibition.

By Chapter 356 of the Acts of 1972, the General Assembly created the "Maryland Oil Disaster Containment, Clean-up and Contingency Fund," *compare* Env. §§ 4–701 through 4–708, but no change was made to the Prohibition or to the Private Remedy Section. Similarly, no changes were made to the two sections under consideration when the water pollution laws were substantially amended by Chapter 739 of the Acts of 1973.

The Private Remedy Section became part of the new Natural Resources Article (NR), effective January 1, 1974, as enacted by Chapter 4 of the Acts of the first extraordinary session of 1973. Codified as NR § 8–1409, the Private Remedy Section was changed only in style ("damages" was changed to "damage"). *See* Md.Code, NR (1974), Revisor's Note following § 8–1409. The Prohibition, then codified as NR § 8–1410(a), continued to be limited to discharges of oil from "any vessel, ship, or boat of any kind."

At the 1980 session the General Assembly twice considered Subtitle 14 of Title 8 of the Natural Resources Article. Chapter 27 of the Acts of 1980 legislatively ratified an executive order reorganizing DNR and transferring certain environmental regulatory functions, including the administration of Subti-

---

Our construction of the Private Remedy Section makes unnecessary opining as to whether the excision of the House amendment indicates that the bond should be forfeited only if there were fault and, if that were the case, whether that intention influences or controls the Private Remedy Section as well.

tle 14, to DHMH.  Then, by Chapter 815 of the Acts of 1980, the General Assembly reversed some of those allocations of authority, and enforcement of Title 8, Subtitle 14 was returned to DNR.  No substantive changes were made to the Private Remedy Section or to the Prohibition.

The limitation in the Prohibition to discharges from a vessel, ship, or boat was deleted by Chapter 182 of the Acts of 1984 which also added the exception for discharges pursuant to a permit.  The expansion by Chapter 182 of the conduct in violation of the Prohibition had the effect of enlarging those acts subject to criminal and administrative sanctions, but it did not affect the Private Remedy Section.  Chapter 182 did not enlarge the Private Remedy Section by express words.  That section continued to apply to damage from "the spillage."  The Private Remedy is not expressly available for all discharges of oil that violated the Prohibition.

Moreover, Chapter 182 did not broaden the Private Remedy Section by necessary implication.  The legislative history of Chapter 182 does not reveal any purpose to expand the Private Remedy Section.  The bill that became Chapter 182 was prepared by DNR and introduced as a departmental bill.[10] The bill report from DNR described the purpose of enlarging the Prohibition to be

"to add provisions to subtitle 14 which clearly make the discharge of oil in any manner ... so as to cause pollution ... a violation of the Natural Resources Article.  Establishing a water pollution violation under subtitle 14 with regard to oil ... will enable [DNR] *in its enforcement in situations of oil ... pollution to utilize the injunctive and civil penalty provisions* appearing at the end of the subtitle."

(Emphasis added).  The enforcement mechanisms and sanctions referred to by DNR included appropriate "legal action" by the Attorney General to correct violations of orders, NR

---

10.  The bill that became Chapter 182 also deleted from the enumeration of powers of DNR certain powers that had been transferred to DHMH in 1980, and the bill also added a prohibition against the pollution of waters by sediment.  1984 Md. Laws Ch. 182, at 604–07.

(1974, 1983 Repl.Vol.), § 8–1414, injunctive relief, § 8–1415, civil penalties, § 8–1416, and criminal prosecution carrying fines, imprisonment, or both, § 8–1417.

Former NR §§ 8–1409, the Private Remedy Section, and 8–1410, the Prohibition, were transferred to the new Environment Article by Chapter 306 of the Acts of 1987 as §§ 4–409 and 4–410, respectively.

What currently appears as subsection (b) of Env. § 4–409 (for text *see* note 7, *supra)* was added by Chapter 67 of the Acts of 1990. That enactment added both a definition of USTs to the subtitle, *see* current Env. § 4–401(k), and, in subsection (b) of § 4–409, required the "owner" of an UST to furnish evidence of financial responsibility for cleanup, corrective action, and "third party liability." Section 4–409(b) does not define third party liability.

As suggested by Env. § 4–409(b)(3), Chapter 67 of the Acts of 1990 was prompted by federal legislation, Subtitle I of the Resource Conservation and Recovery Act, now codified in subchapter IX, "Regulation of Underground Storage Tanks," of Chapter 82 of 42 U.S.C. (§§ 6991 through 6991i). The federal act requires the United States Environmental Protection Agency (EPA) to promulgate regulations concerning USTs that include "requirements for maintaining evidence of financial responsibility for taking corrective action and compensating third parties for bodily injury and property damage caused by sudden and nonsudden accidental releases arising from operating an underground storage tank." 42 U.S.C. § 6991b(c)(6) (1995). The federal statute contemplates EPA approval of state programs for detection, prevention, and correction of UST releases, including requirements for maintaining evidence of financial responsibility, that are no less stringent than the corresponding federal requirements promulgated by EPA. *Id.* at § 6991c.

The federal regulations on financial responsibility were initially promulgated October 26, 1988. 53 Fed.Reg. 43,370 (1988).

The required amount of financial responsibility to be evidenced by the owner of from one to one hundred petroleum USTs is $1 million. 40 C.F.R. § 280.93(b)(1) (1996). "Critics of the UST program argued that the UST regulations would run small gasoline station operators out of business, by requiring them to purchase expensive insurance policies and make large capital improvements." A.R. Hayward, *Common Law Remedies and the UST Regulations,* 21 B.C. Envtl. Aff. L.Rev. 619, 640 (1994).

In its 1989 session the General Assembly enacted a bill that would have created an insurance fund for owners and operators of USTs. The Governor, however, vetoed the bill, and on May 30, 1989, he appointed a study commission. *See* Report of the Governor's Task Force on Underground Storage Tanks (1990) (the Report), at 7. The Report recommended that, even for stations having twelve or fewer USTs, the owners of the tanks should be responsible for meeting the financial assurance requirements. Report at 42–43. As introduced, the bill which became Env. § 4–409(b) implemented the Report by requiring MDE to adopt regulations placing responsibility on the owner of the UST to evidence financial responsibility. 1990 Md. Laws Ch. 67, at 457–60. The bill, however, was amended to add the special definition of owner now found in § 4–409(b)(1). *Id.* at 460. *But compare* the more conventional definitions of an owner of an UST in use after 1984 in Md. Regs.Code tit. 26, § 10.02.04(39) (1991) (COMAR) and in 40 C.F.R. § 280.12 (1996).[11]

When MDE adopted regulations for UST financial responsibility the regulations incorporated "by reference the provisions contained in 40 C.F.R. §§ 280.90–280.116, as amended through February 18, 1993...." COMAR 26.10.11.01A. Under the incorporated federal regulations concerning financial responsibility, the compliance date in Maryland eventually

---

11. An "owner" under both COMAR 26.10.02.04(39) and 40 C.F.R. 280.12 is "(a) [i]n a case of an UST system in use on November 8, 1984, or brought into use after that date, any person who owns an UST system used for storage, use, or dispensing of regulated substances."

became December 31, 1993, for UST owners in the class into which Wheeler falls. 40 C.F.R. § 280.91(d) (1996).

■ In the instant case we shall assume, *arguendo*, that the UST financial responsibility regulations make the owner of an UST an insurer against damage caused by UST leaks to the maximum required financial responsibility. *See* C.C. Gauthier, *The Enforcement of Federal Underground Storage Tank Regulations*, 20 Envtl. L. 261, 287 (1990) (advancing thesis that the federal regulations intend strict liability). JBG, however, does not rest its statutory cause of action on Env. § 4–409(b) (we infer, because of the December 31, 1993 compliance date). Instead, JBG rests on § 4–409(a). The enactment of subsection (b) made no change in subsection (a), did not alter the original intent of subsection (a), and cannot retroactively enlarge the liability imposed by subsection (a) on the person responsible for the spillage from a vessel, ship, or boat to include the owner of an UST.

Because § 4–409(a) does not apply to a discharge from an UST, JBG's statutory cause of action based on § 4–409(a) does not lie against any defendant. Consequently, the special verdict finding assumption of the risk is immaterial as applied to the cause of action predicated on § 4–409(a).

## II

We now consider the assumption of the risk defense to the trespass claim. Without objection from any defendant, the circuit court instructed the jury that "[a] trespass occurs when a person without authority, privilege or permission enters into the land of another or permits a substance under that person's control to enter the land of another without authority, privilege or permission." [12] The jury's special verdict found that each of the three appellees "trespassed on JBG's property" and separately found that JBG assumed the risk of contamina-

---

12. Because the issue is not before us, we express no opinion as to whether the instruction correctly states the Maryland law to be applied to the subsurface migration across a property line of a pollutant in or on ground water.

tion when it purchased the 1901 Chapman Avenue property. Based on the latter finding the circuit court entered judgment for the defendants on the trespass claim, a ruling that JBG contends is erroneous. In this Court, Wheeler, Chevron, and Exxon join in arguing that the judgments in their favor on the trespass claim should be sustained based on assumption of the risk.

■ Assumption of the risk is a defense applicable to negligence claims. "Assumption of the risk and contributory negligence are closely related and often overlapping defenses." *Schroyer v. McNeal,* 323 Md. 275, 280, 592 A.2d 1119, 1121 (1991). " '[A]ssumption of the risk defeats recovery because it is a previous abandonment of the right to complain if an accident occurs.' " *Id.* at 281, 592 A.2d at 1122 (quoting *Warner v. Markoe,* 171 Md. 351, 360, 189 A. 260, 264 (1937)). " 'The defense of assumption of risk rests upon the plaintiff's consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of harm from a particular risk.' " *Id.* at 282, 592 A.2d at 1122 (quoting *Gibson v. Beaver,* 245 Md. 418, 421, 226 A.2d 273, 275 (1967), in turn quoting W. Prosser, *Handbook of the Law of Torts* § 55, at 303 (2d ed. 1955)).

Only a few decisions have addressed the subject issue, and they all state that assumption of the risk is not defensive to trespass. In *Victor v. Sell,* 301 Minn. 309, 222 N.W.2d 337 (1974), the plaintiff fell from a ladder while working on the outside of his home and landed on a piece of a radiator. The plaintiff's neighbor, a defendant, had recently had the plumbing in his house repaired, and the plumbing contractor, a co-defendant, had discarded radiators and radiator parts on the outside of the neighbor's house. 222 N.W.2d at 338. Whether the radiator piece struck by the plaintiff was on the plaintiff's property was disputed, and there was evidence that striking this hard object exacerbated the plaintiff's injuries. *Id.* at 338–39. Only the plaintiff's trespass claim was submitted to the jury, together with special interrogatories concerning contributory negligence and assumption of the risk. The jury

found no trespass and that both affirmative defenses applied. *Id.* at 339. The Supreme Court of Minnesota, in considered *dicta*, said the following concerning the defenses:

"Since the sole theory of liability upon which the jury was instructed was trespass, the trial court erred in explaining contributory negligence and assumption of risk to the jury, indicating they might be defenses, and posing questions about them in the special verdict. Negligence on the part of the plaintiff is not a defense to an intentional tort. Nor, unless it amounts to consent, is assumption of risk. Prosser, Torts (3 ed.), §§ 18, 64, 67; 2 Harper and James, Law of Torts, § 22.5; Restatement, Torts 2d, §§ 481, 496A to 496G."

*Id.* at 341. Judgment for the defendants, however, was affirmed because the instructions on trespass were proper. *Id.*

In *Donahue v. S.J. Fish & Sons, Inc.,* 1995 WL 562216, 1995 CONN.SUPER. 2618 (Conn.Super.CT, Sept. 18, 1995), the court struck assumption of the risk from special defenses asserted in the defendant's answer to certain claims, including trespass. The court held: " 'Assumption of the risk is a defense to an action for negligence.... This is not a negligence action or a defense.' " *Id.* at *3, 1995 LEXIS at 7 (quoting *First Maryland Fin. Servs. Corp. v. District–Realty Title Ins. Corp.,* 548 A.2d 787, 790 (D.C.1988)). The Connecticut court further noted that the defendant, the landlord in a landlord-tenant dispute, "remains free to show actual consent to his entry." *Id.* at *3, 1995 LEXIS at 8.

*First Maryland Fin. Servs.,* from which the Connecticut court quoted, was an action by a title insurance agency for a declaration that it equitably held title to property that had been the subject of a foreclosure. The foreclosure purchaser's check was dishonored, but the title agency had paid the foreclosing lender. 548 A.2d at 788. An adverse claimant to the title argued that the plaintiff had assumed the risk by its premature disbursement of funds. In that context the court stated that "[a]ssumption of the risk is a defense to an action for negligence." *Id.* at 790.

The Court of Special Appeals, in an assault and battery case, cited numerous other assault and battery cases and stated that "[t]hese cases plainly establish that the doctrine of assumption of risk does not bar recovery for intentional torts." *Janelsins v. Button,* 102 Md.App. 30, 42, 648 A.2d 1039, 1045 (1994).

The defendants in the case before us disclaim that assumption of the risk applies to an intentional trespass ("No evidence exists to prove[ ] that the alleged trespass in the case at bar was intentional." Joint Brief of Appellees on Common Issues at 29–30). Rather, their position is that assumption of the risk "should apply to any trespass due to nonpurposeful or negligent conduct." Joint Brief at 30. That contention fails in the instant matter for the additional reason that the jury found that no defendant was negligent.

■ "[A]n appellate court must view a case in a way that reconciles the jury's verdicts if at all possible." *Eagle–Picher Indus. v. Balbos,* 84 Md.App. 10, 35 n. 12, 578 A.2d 228, 240 n. 12 (1990), *aff'd in part, rev'd in part on other grounds,* 326 Md. 179, 604 A.2d 445 (1992). The special verdict on trespass can be reconciled with the special verdict on negligence by interpreting the former as a finding that the entry of the gasoline onto the plaintiff's land was unintentional and non-negligent.

■ This Court has recognized that a trespass to land may be both unintended and non-negligent. *Blaen Avon Coal Co. v. McCulloh,* 59 Md. 403, 417 (1883) ("It is well settled that a trespasser, though misled by a *bona fide* mistake as to his title, or who has taken every precaution to keep within his own lines, cannot escape liability for the injury done, being bound in law to know the limits of his possessions."). *See also Atlantic & George's Creek Consol. Coal Co. v. Maryland Coal Co.,* 62 Md. 135, 143–44 (1884) (same).

■ Inasmuch as the defense of assumption of the risk does not apply in the instant matter, and inasmuch as Wheeler's argument in this Court against the finding that he tres-

passed rests exclusively on assumption of the risk, the judgment in favor of Wheeler will be reversed and the matter remanded as to him for the assessment of damages.

### III

Exxon and Chevron separately submit arguments that the evidence was insufficient to permit the jury to find them liable in trespass, even if, as we have held above, the defense of assumption of the risk does not apply to trespass.

### A

Exxon submits that there was insufficient evidence of its control over station operations or over the USTs to support trespass liability on its part. Essentially Exxon contends that Wheeler independently owns and operates the station. According to Exxon, after it paid for the station improvements, including the new USTs which became operational in December 1990, its relationship with Wheeler was simply that of a seller of Exxon-brand gasoline to a retailer. In *Chevron, U.S.A., Inc. v. Lesch,* 319 Md. 25, 570 A.2d 840 (1990), and *B.P. Oil Corp. v. Mabe,* 279 Md. 632, 370 A.2d 554 (1977), both involving independently owned service stations which sold oil company brand products, we held that there was insufficient evidence of control by the oil companies to impose vicarious liability upon the oil companies for torts committed by the independent operators.

JBG does not assert that Exxon exercised sufficient control by merely having sold Exxon gasoline to Wheeler that percolated to 1901 Chapman Avenue. Rather, JBG contends that the documentation of the agreement under which Exxon paid for the renovation of Wheeler's station permitted the jury to find that Exxon owned the USTs for all of the period from December 1990 to trial, or for at least a portion of that period sufficient to support trespass liability.

Each party purports to find support for its position in *Rockland Bleach & Dye Works Co. v. H.J. Williams Corp.,* 242 Md. 375, 219 A.2d 48 (1966), a Maryland common law

trespass case. There, in order to support a section of a highway, the defendant, a contractor working for the State Roads Commission, had created a fill 50 feet high and 390 feet wide at the base. *Id.* at 379, 219 A.2d at 49. The fill was adjacent to the plaintiff's reservoir that supplied over 600,000 gallons of water each day to the plaintiff's bleach and dye works. *Id.* at 379, 219 A.2d at 49–50. A rain storm washed earth from the fill into the reservoir, completely blocking its intake and feeder pipes. This Court reversed a directed verdict for the defendant on the trespass claim. *Id.* at 390, 219 A.2d at 55–56. The defendant argued, *inter alia,* that it had insufficient control because it was obliged to follow the drainage plan designed by the State Roads Commission, but we held that the specifications were not so confining, inasmuch as they required the contractor to take all possible precautionary measures to avoid damage from drainage waters. *Id.* at 386–87, 219 A.2d at 53–54. This Court said that "when an adjacent property is invaded by an inanimate or intangible object it is obvious that the defendant must have some connection with or some control over that object in order for an action in trespass to be successful against him." *Id.* at 387, 219 A.2d at 54.[13]

The contract between Wheeler and Exxon was executed September 27, 1990, and consists of a basic sales agreement together with numerous riders. All of the documents are form agreements prepared by Exxon containing blanks into which the specifics of a particular transaction are to be inserted.

One of the documents executed in connection with the sales agreement is the amortization agreement of September 27, 1990. Under it Exxon agrees to perform certain work and provide certain items, including new USTs, estimated to cost a total of $488,300. The amortization agreement contains a

---

**13.** *Rockland Bleach & Dye* involved surface waters while the instant matter is concerned with the subsurface percolation of liquids. No party in this case argues that the distinction makes any difference from the standpoint of the Maryland law of trespass. *See* note 12, *supra.*

provision dealing with possible termination of the sales agreement before Wheeler had purchased 21,600,000 gallons of Exxon gasoline. In that event Wheeler would pay Exxon $0.0226 per gallon for that number of gallons equal to the difference between 21,600,000 gallons and the total gallons actually purchased by Wheeler.

The amortization agreement further states: "It is expressly understood that upon payment of the foregoing sum Dealer shall have the ownership of, maintenance responsibility for, and any liabilities associated with this work." It is undisputed that Exxon paid for the improvements. JBG seeks to read "this work" in the amortization agreement provision quoted above as referring to the construction activity and not to the finished work. The argument is frivolous because one does not refer to "ownership of" construction labor.

JBG also relies on another rider to the sales agreement, the "Loaned Equipment and Sign Rental Agreement." Two documents incorporated by reference into this rider are relevant to JBG's argument. One of the incorporated documents relates to equipment owned by Exxon and leased to Wheeler, and the other incorporated document deals with maintenance obligations. JBG's argument attempts to muddle the two.

The introductory paragraph of the loaned equipment and sign rental agreement in relevant part reads:

"In connection with Buyer's purchase of petroleum products from Seller at the premises defined in the attached Sales Agreement, it is understood and agreed that Seller has or will install on the service station premises certain tangible personal property, hereinafter referred to as 'equipment', listed in the attached Fixed Assets Investment Ledger Form or other accounting form listing said equipment.... With respect to the lease of such equipment, Seller is hereinafter called 'Lessor' and Buyer is hereinafter called 'Lessee.'"

The "Fixed Assets Verification Listing" executed by Wheeler and Exxon on September 27, 1990, lists five types of leased items, but it does not list any USTs. In other words, owner-

ship of the USTs was not retained by Exxon. Wheeler acquired ownership of the USTs when Exxon paid for the improvements.

Paragraph three of the loaned equipment and sign rental agreement reads in relevant part:

"Lessee shall repair or replace the equipment leased hereunder, at Lessee's expense, in accordance with Exhibit A, Maintenance, Repair and Replacement Obligations, attached hereto and made a part hereof. Upon written notice from Lessee, Lessor shall make all repairs to the equipment leased hereunder which are not Lessee's responsibility as described in Exhibit A. . . ."

Exhibit A is captioned "Loaned Equipment and Sign Rental Agreement (Rider to Sales Agreement), Maintenance, Repair and Replacement Obligations." It presents three columns, the first listing classes of items, the second describing obligations to be performed at Lessee's expense, and the third describing obligations to be performed at Exxon's expense. An asterisk immediately following the heading for the column listing Exxon's obligations directs the reader to a footnote, which is printed in type larger than the type used in the text of the exhibit and which reads: "Repair responsibility limited to items owned and leased to lessee by Exxon." Inasmuch as the USTs were not leased by Exxon to Wheeler, Exxon had no repair responsibility for them.

JBG's argument seems to be that, because the exhibit dealing with maintenance, repair, and replacement obligations contains a section dealing with "tanks," the document was ambiguous as to whether the USTs become part of the "Loaned Equipment," thereby presenting a jury question.

■ The interpretation of a written contract is ordinarily a question of law for the court. *Suburban Hosp., Inc. v. Dwiggins*, 324 Md. 294, 306, 596 A.2d 1069, 1075 (1991), and cases cited therein. We find no ambiguity. All of the form documents involved are created for multiple possible applications. In their application to the agreement with Wheeler, there was no lease of USTs. The fact that the forms and accompanying

schedules can accommodate the leasing of USTs and repair obligations concerning them in some other transaction is immaterial to the transaction with Wheeler.

The record also contains two different forms of bills of sale of the USTs from Exxon to Wheeler. Both forms were executed on July 1, 1991, but one form was retroactively effective to May 16, 1991. These documents confirm, but do not alter, the legal effect of the documents executed in September 1990. When Exxon paid for the remodeling of Wheeler's station in consideration of Wheeler's promise to purchase gasoline from Exxon, Wheeler became the owner of the USTs with the obligation to maintain them.

We hold that Exxon had insufficient control, as a matter of law, to permit a finding of liability for trespass.

## B

Chevron submits that there was insufficient evidence of causation in fact to support the jury's finding that it was liable in trespass. Chevron had operated the service station prior to 1976, leased it to Wheeler from 1976 to 1978, and sold the station to Wheeler in 1978, but thereafter Chevron continued to sell its product to Wheeler through 1981. From 1976 through 1981 Chevron sold gasoline to Wheeler under a "meter marketing plan," a form of consignment sale under which Chevron continued to own the gasoline until it was dispensed at the pump. Further, JBG produced evidence, based upon the chemical analysis of gasoline withdrawn from the monitoring wells on the 1901 Chapman Avenue property after its purchase by JBG, that the gasoline contained ingredients that were discontinued as gasoline additives prior to 1981.

Against that background Chevron makes the following submission:

"Appellant failed to meet its burden of establishing that any wrongful conduct for which Chevron is responsible was a proximate cause of the damages for which appellant seeks recovery because appellant concedes that at the time it purchased the property gasoline contamination existed on

the property that did not affect its value and no evidence was introduced to establish that the alleged wrongful conduct of Chevron caused or contributed to the post sale increase in the contamination that appellant contends caused the damage for which it seeks recovery."

Brief of Appellee Chevron at 10 (capitalization and underlining omitted).

Chevron's theory is based on three premises, each of which is either factually disputed or legally erroneous within the framework of the way in which this case has proceeded. Chevron's argument begins with the April 16, 1991 acquisition of 1901 Chapman Avenue by JBG. The contention assumes that JBG's purchase price reflected the market value of the property on the date of acquisition, that JBG seeks as damages only the post-acquisition diminution in value, and that there is no evidence that Chevron gasoline crossed the boundary onto 1901 Chapman Avenue after JBG took possession.

As phrased by Chevron, the argument is that

"[i]n order to prevail against Chevron in this case, [JBG] must rely on two extremely tenuous inferences. First, that some unknown quantity of gasoline alleged to have leaked from the tanks on the Service Station Property in 1978 did not migrate onto the Property [of JBG] until more than fourteen years later. Alternatively, that irrespective of when the gasoline migrated to the Chapman Avenue Property, this gasoline, in some unexplained way, contributed to the increase in contamination occurring in the summer of 1992."

Brief of Appellee Chevron at 15–16.

First, JBG does not concede that there was no diminution in value due to contamination when it took title. Its position is that it did not appreciate the extent of the contamination. Second, JBG did not limit its claim for damages to diminution in the value of the property after it took title. Indeed, counsel for JBG urged the jury to award JBG $114,000 in actual damages based on the cost of JBG's investigation of the underground contamination, in addition to the

diminished value of the property. Third, Chevron's contention ignores the continuing nature of the trespass. Restatement (Second) of Torts § 161(1) (1965) states the rule to be that

"[a] trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there, whether or not the actor has the ability to remove it."

Even if Chevron's gasoline entered the subsurface of 1901 Chapman Avenue before April 16, 1991, its continued presence could be a trespass under the theory of trespass on which this case was tried, without objection. There is no contention that Equitable had consented to the invasion. *Compare Rosenblatt v. Exxon Co., U.S.A.*, 335 Md. 58, 78–79, 642 A.2d 180, 189–90 (1994) (discharge by plaintiff's predecessor in title of pollutants onto ground while owned by predecessor not placed tortiously under Restatement (Second) of Torts § 161).

Accordingly, we reject the argument advanced by Chevron for setting aside the jury's finding that it committed a trespass. The judgment in favor of Chevron will be reversed and the trespass claim against it remanded to the circuit court for a determination of damages in accordance with the special interrogatories that the jury did not reach and answer.

*JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IN FAVOR OF THE APPELLEES, BOBBY JOE WHEELER AND CHEVRON U.S.A. INC., REVERSED, AND CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.*

*JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IN FAVOR OF THE APPELLEE, EXXON COMPANY, U.S.A., AFFIRMED.*

*COSTS TO BE PAID ONE–THIRD BY BOBBY JOE WHEELER, ONE–THIRD BY CHEVRON U.S.A. INC., AND ONE–THIRD BY THE APPELLANT, JBG/TWINBROOK METRO LIMITED PARTNERSHIP.*