Gen. 139]                                                         139

## COUNTIES

CODE HOME RULE COUNTIES – AUTHORITY OF COUNTIES TO
   ENACT LOCAL LAWS UNDER ARTICLE 25, §232,
   CONCERNING FISHING AND SEAFOOD OPERATIONS –
   WHETHER KENT COUNTY MAY ENFORCE LOCAL "RIGHT
   TO FISH" LAW

December 21, 2011

*The Honorable Ronald H. Fithian*
*The Honorable William W. Pickrum*
*The Honorable Alexander P. Rasin*
*County Commissioners of Kent County*

You have asked two sets of questions about Kent County's authority, as a code home rule county, to legislate on seafood harvesting and industry matters.[1] One set of questions concerns a State law recently made applicable to Kent County. That statute, codified at Annotated Code of Maryland, Article 25, §232, authorizes a county to enact certain types of legislation concerning the fishing and seafood industry after obtaining the consent of the Secretary of Natural Resources ("Secretary"). With respect to §232, you ask:

1. What kind of legislation is authorized by §232? In particular, would the Secretary's prior consent under §232 to a county's legislation on fishing and seafood industry matters exempt that legislation from preemption by State laws?

2. Does §232 require a code home rule county to secure the consent of the Secretary before adopting zoning or land use provisions that authorize the use of real property for a seafood business or the storage of seafood business equipment?

In our opinion, the answers to your questions concerning §232 are as follows:

---

[1] In compliance with our policy concerning requests for opinions from local governments, the County provided a legal analysis by the County Administrator, a licensed attorney.

1.    Section 232 adds "seafood business" and "seafood harvesting" to the subjects on which counties may legislate. However, it does not empower a county to enact legislation that would otherwise be preempted by State laws and regulations. Rather, it provides the county and the Secretary with a mechanism by which to determine whether proposed county legislation would likely be preempted by the laws, regulations, and program guidance administered by the Department of Natural Resources ("DNR").

2.    The provision concerning the Secretary's consent in §232 applies only to actions taken by a county under that statute. Section 232 does not require a code home rule county to obtain the consent of the Secretary before exercising its powers to regulate land use under Annotated Code of Maryland, Article 66B.

Your second set of questions concerns an ordinance passed by the Kent County Commissioners in 2009 entitled "Fish and Seafood Operations," now codified as Chapter 89 of the Kent County Code. That ordinance, sometimes referred to as a "right to fish" law, purports to limit private civil actions brought against seafood and fishing operations conducted "in accordance with generally accepted seafood and fishing industry practices." It additionally requires a person who wishes to file a common law trespass or nuisance action concerning seafood operations to first pursue an administrative remedy before a county board. The county board's decision is then to be presumed correct in any later judicial proceedings. With reference to the Kent County ordinance, you ask:

3.    Prior to the enactment of §232, could a code home rule county enact a "right to fish" ordinance that restricts common law trespass and nuisance actions?

4.    May a code home rule county condition the filing of a common law action involving seafood operations on the issuance of an administrative decision by a county board and require the courts to accord that decision a presumption of correctness?

In our opinion, the answers to your questions concerning the County ordinance are as follows:

3.    Neither the Maryland Constitution nor other State law confers on a code home rule county the authority to enact "right to fish" legislation that restricts the filing of common law trespass and nuisance actions. Although the General Assembly has expressly

repealed aspects of those common law torts as against agricultural operations, it has not done so for seafood operations. Section 232 did not authorize the passage of local "right to fish" laws.

4.    Neither the Maryland Constitution nor other State law confers on a code home rule county the authority to impose conditions on a person's access to a judicial remedy for common law torts arising out of the conduct of a seafood operation. A code county also lacks the authority to create evidentiary presumptions for such an action.

# I

## Effect of §232 on a Code County's Powers

Your first two questions concern the interpretation of §232. The basic approach to statutory construction is well known. As relevant here, it begins with the language of the statute. When that language, both on its face and in context, is clear and unambiguous:

> [W]e need go no further. We give the language its plain meaning. We do not add or delete words in order to reflect an intent not evidenced by what the Legislature actually said and we do not construe statutes with forced or subtle interpretations that limit or extend its application.

*Swinson v. Lords Landing Village Condo.*, 360 Md. 462, 478, 758 A.2d 1008 (2000) (citations and internal quotation marks omitted). Information from the legislative history of the statute, however, can be helpful to confirm what appears to be its plain meaning. *Ali v. CIT Technology Financing Svcs, Inc.*, 416 Md. 249, 261, 6 A.3d 890 (2010). Additionally, a statute should be harmonized with other statutes addressing the same subject, to the extent reasonably possible. *Gwin v. Motor Vehicle Admin.,* 385 Md. 440, 462, 869 A.2d 822 (2005); *see also Higginbotham v. PSC*, 412 Md. 112, 133-34, 985 A.2d 1183 (2009) (statutes should be construed to avoid repeal by implication of other statutes).

### A.    *Article 25, §232*

Originally enacted in 2004, §232 did not apply to Kent County until this year, when it was amended to apply to every county.[2] Chapter 385, Laws of Maryland 2011.  As of October 1, 2011, it provides:

> (a) Subject to subsection (b) of this section, the governing body of a county may adopt an ordinance, resolution, or regulation or take any other action that the governing body considers necessary to authorize a person to:
>
> (1) Use the person's personal property or real estate to operate a seafood business;
>
> (2)   Buy or sell seafood;
>
> (3)   Store equipment used in the person's seafood business;
>
> (4)   Enjoy the quiet conduct of the person's seafood business in conformance with county and State requirements; and
>
> (5)   Harvest seafood.
>
> (b) (1)   Before adopting an ordinance, resolution, or regulation under subsection (a) of this section, the governing body of the county in which the ordinance, resolution, or regulation will apply shall:
>
> (i) Hold a public hearing and provide reasonable notice of the hearing; and

---

[2] As originally enacted, §232 applied only to Dorchester County. Chapter 134, Laws of Maryland 2004.  Later amendments extended its application to Calvert, Queen Anne's, and Somerset counties.  Chapter 588, Laws of Maryland 2007; Chapter 324, Laws of Maryland 2008.

(ii) Obtain the written consent of the Secretary of Natural Resources.

(2) An ordinance, resolution, or regulation adopted without the written consent of the Secretary of Natural Resources is void and without legal effect.

(c) In the event of a conflict, federal law, State law, or written program guidance issued by a federal or State agency shall preempt any ordinance, resolution, or regulation adopted or any other action taken by the governing body of a county under this section.

You asked generally what kind of legislation §232 authorizes. The statute authorizes counties specifically to enact laws "necessary" to authorize a person to carry out a variety of activities in the field of seafood business and harvesting ("seafood operations") in conformance with county and State requirements. In the case of a code county, it appears to elaborate on the county's existing authority to enact "fish and game" laws. *See* Article 25B, §13 (incorporating Article 25A, §5(m)). It is otherwise difficult to sketch the boundaries of this authority in the abstract, as a variety of other laws can govern particular activities relating to seafood operations. A significant question, as you suggested, is how §232 might affect State laws that would otherwise preempt local action in this field.

### B. Effect of §232 on Possible State Preemption of County Legislation

Section 232(b)(1)(ii) conditions a county's authority to enact legislation concerning seafood operations, in part, on the written consent of the Secretary. You ask whether this consent requirement empowers a code county to adopt measures that would otherwise be preempted by State laws. In our opinion, it does not.

### 1. Preemption

In Maryland, State preemption of local law "is grounded upon the authority of the General Assembly to reserve for itself exclusive dominion over an entire field of legislative concern." *Ad+Soil, Inc. v. County Commissioners*, 307 Md. 307, 324, 513 A.2d 893 (1986).

Accordingly, to determine whether county regulation of a particular activity is preempted by State law, the courts look to whether the Legislature intended to retain, delegate, or share its power to regulate the field in which the activity falls. *See id.* at 324-26. The Legislature's intent in this regard is generally manifested in three ways: expressly, by conflict, or impliedly.

The Legislature makes its intent to preempt local regulatory efforts "express" by enacting an explicit preemption clause specifying the effect of a State law on local measures. *Worton Creek Marina, LLC v. Claggett,* 381 Md. 499, 512 n.6, 850 A.2d 1169 (2004). *See, e.g.,* Annotated Code of Maryland, Public Safety Article, §5-104 ("... the State preempts the right of any local jurisdiction to regulate the sale of a regulated firearm").

In the case of preemption by conflict, the Legislature's intent to displace local regulation is generally clear, either through "a verbal conflict" – when the State law prohibits what the local measure permits or *vice versa* – or through a "functional conflict"– when the impact of the local law interferes with the State law's function. *See Mayor of Baltimore v. Hart*, 395 Md. 394, 407-9, 910 A.2d 463 (2006); *see also Coalition for Open Doors v. Annapolis Lodge No. 622,* 333 Md. 359, 380 n. 39, 635 A.2d 412 (1994); 89 *Opinions of the Attorney General* 195 (2004) (county's trapping laws, while within its power to pass "fish and game laws," were preempted by conflicting State law).

Preemption is implied when "local law [d]eals with an area in which the Legislature has acted with such force that an intent by the State to occupy the entire field must be implied[.]" *Talbot County v. Skipper*, 329 Md. 481, 488, 620 A.2d 880 (1993) (citations and quotations omitted). The "comprehensiveness with which the General Assembly has legislated the field" is the "primary indicia" of an "intent by the State to occupy the entire field...." *Id.* An array of "secondary factors" may also be applied, including "whether a state agency responsible for administering and enforcing the state law has recognized local authority to act in the field." *Allied Vending v. City of Bowie*, 332 Md. 279, 299, 631 A.2d 77 (1993) (citation and internal quotation marks omitted).

The fact that the General Assembly has legislated on a particular subject does not invariably preclude all local regulation of a field. When a State statute "simply excludes a particular activity" from its coverage, "supplementary local legislation" might not be

preempted by that State statute. *Coalition for Open Doors,* 333 Md. at 380; *see also Hart*, 395 Md. at 409 (city directive on the operation of emergency vehicles supplemented State statute on the same subject because the directive and the statute furthered the same purpose); *Mayor and City Council v. Sitnick*, 254 Md. 303, 323-24, 255 A.2d 376 (1969) (city ordinance imposing a minimum wage on certain businesses supplemented State minimum wage law and therefore was not preempted). Similarly, dual regulatory processes may co-exist when the county's regulation does not conflict with the State's regulation. *See, e.g., Maryland Reclamation Associates v. Harford County*, 414 Md. 1, 40, 994 A.2d 842 (2010) (State waste disposal permitting process complemented, rather than preempted, the county's planning and zoning role).

### 2.     Effect of the Secretary's Consent

Section 232(b)(1)(ii) conditions passage of a local ordinance concerning seafood operations on the written consent of the Secretary. Section 232(b)(2) reinforces that condition by declaring that a local law is "void and without legal effect" in the absence of such consent. You have asked whether such consent would inoculate the ordinance from preemption by State law. For three reasons, it would not.

First, the statute itself makes a county measure approved by the Secretary expressly subject to preemption by conflict. Section 232(c) provides: "[i]n the event of a conflict, ... State law, or written program guidance issued by a ... State agency shall preempt any ordinance, resolution, or regulation adopted or any action taken by the governing body of a county *under this section*." §232(c) (emphasis added). Because an action taken "under this section" could only come into existence upon the Secretary's consent under subsection (b), subsection (c) necessarily applies only to county measures already approved by the Secretary. Accordingly, the Secretary's consent would not save a county measure from preemption by a conflicting State law or agency program guidance. Whether a county measure is in fact preempted by conflict will depend on whether the local measure permits what the State law prohibits (or *vice versa*), or interferes with the State law's function.

Second, while §232(c) codifies the concept of conflict preemption, it does not address whether the Secretary's consent would save a county measure from implied preemption. In our opinion, the Secretary's consent under §232 would not necessarily

have that effect. The Secretary's recognition of local authority to act on a subject would instead be one part – a "secondary factor" under the case law – of a court's analysis of whether the Legislature intended to occupy that field. While the Secretary's views would likely be accorded the deference ordinarily given an agency's interpretation of the laws it administers, they would not be conclusive. *See Grasslands Plantation, Inc. v. Frizz-King Enters.*, *LLC*, 410 Md. 191, 204, 978 A.2d 622 (2009)(addressing the scope of the deference to be accorded to an agency's interpretation of the laws it applies). Moreover, the relevance of the Secretary's consent to the question of legislative intent would be attenuated at best for county measures falling within the purview of an agency other than DNR, or within an area, such as Critical Areas regulation, in which the Legislature has expressly defined the respective roles of the local legislative bodies and the State. Thus, the Secretary's consent to passage of a county measure would not necessarily establish the Legislature's intent to share the field with local governments.[3]

Furthermore, the consent provision of §232(b)(1)(ii) would be constitutionally suspect if interpreted to give the Secretary the final authority to approve local laws that conflict with State laws. The Court of Appeals has explained:

> The delegation doctrine prohibits a legislative body from delegating its law-making function to any other branch of government or entity and is a corollary of the separation of powers doctrine implicit in the United States Constitution and expressly provided in the Maryland Constitution.

*Maryland State Police v. Warwick Supply & Equip. Co*., 330 Md. 474, 480, 624 A.2d 1238 (1993). While the Court has "long sanctioned delegations of legislative power to administrative officials where sufficient safeguards are legislatively provided for the guidance of the agency in its administration of the statute," *id*.,

---

[3] For example, the Secretary's consent to county legislation in a field extensively regulated by the Maryland Department of the Environment ("MDE") would neither inoculate the county measure against preemption nor exempt the subject of the regulation from the MDE permitting processes. *See, e.g.*, *Maryland Reclamation Associates*, 414 Md. at 40 (noting the "dual nature" of the permitting process for waste-disposal operations).

the consent provision provides no criteria to guide the Secretary's decision and thus no safeguards. In our view, the consent provision should be construed simply as a mechanism allowing the Secretary to forestall the enactment of county legislation on matters that are properly addressed solely by DNR under State law.[4]

### 3. Summary

The Secretary's consent under paragraph (b)(1)(ii) would not save a county measure from preemption by State laws or written program guidance. The extent to which a county measure would in fact be preempted by State law or written program guidance will depend on the particular measure and the relevant State law.

### C. *Effect of §232 on County's Exercise of Zoning and Land Use Powers*

You ask whether §232 makes the Secretary's consent a prerequisite to Kent County's adoption of zoning and land use measures that authorize the use of real property for seafood operations. In our opinion, so long as the County is exercising powers granted by other statutes, the consent requirement of §232(b)(2) does not apply.

---

[4] For example, the Secretary "is responsible for conservation management of the fish, fisheries, fish resources and aquatic life within the State." Annotated Code of Maryland, Natural Resources Article ("NR"), §4-202. More particularly, under NR §4-215, DNR is responsible for preparing and adopting fishery management plans governing the harvesting of 24 identified fisheries and any others for which DNR determines the need for a plan. The "General Assembly intends that [DNR] shall manage [those] fisheries ... for the benefit of all citizens of the State." NR §§4-215(b) and (c) and 4-215.3. These specific fisheries management provisions likely prevail over the general grant of power in Article 25B, §13 (incorporating Article 25A, § 5(M), which empower a code county to enact "fish and game laws"). *See Passnault v. Board of Administrative Appeals*, 309 Md. 466, 475, 525 A.2d 222 (1987) ("where there is a specific enactment and a general enactment, and the general enactment includes what is embraced in the former, the particular enactment is operative and the general enactment governs only such cases within its general language as are not within the provisions of the specific enactment").

### 1. Land Use Powers of a Code County under Articles 25B and 66B

In 1970, Kent County chose to become a "code county," governed through a board of county commissioners. Its powers are thus derived from Article XI-F (the "Code Home Rule Amendment") and the statutes applicable to counties choosing that method. The main sources of the zoning and land use powers granted to code counties are Articles 25B and 66B of the Annotated Code of Maryland.[5]

Article 25B, §13 (incorporating Article 25A, §5(X)), authorizes a code county "to enact local laws, for the protection and promotion of public safety, health, morals, and welfare relating to zoning and planning...." Moreover, the General Assembly has declared that it is "the policy of this State that planning and zoning controls shall be implemented by local government." Article 25A, §5(X)(2)(ii). Those powers are expressly limited by a preemption clause, which provides, in part, that the granted powers "shall not be construed ... [t]o preempt or supersede the regulatory authority of any State department or agency under any public general law." Article 25A, §5(X)(2)(v)(4).

Article 66B, which applies to certain local legislative bodies, including a code county's governing body, significantly elaborates on land use powers. *See Grasslands Plantation,* 410 Md. at 212. It reiterates the policy that "[p]lanning and zoning controls be implemented by local governments." Article 66B, §4.01(a)(1)(ii). It implements that policy by authorizing a local legislative body to divide its jurisdiction into districts, or zones, and within those districts, to "regulate and restrict the ... use of buildings, structures, or land." §4.02(a)-(b). The regulations adopted by a local legislative body must be designed to accomplish seven general purposes, including "[p]romot[ing] health and the general welfare,"

---

[5] The Court of Appeals has remarked on the complexity of "[t]racing the entire panoply of related enabling statutes in Maryland." *Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 542, 814 A.2d 469 (2002). Here, we describe only the statutes which bear most directly on your questions, and only in the detail relevant to the discussion. Numerous other State statutes and programs bear on a code county's land use and zoning decisions. *See, e.g*, Annotated Code of Maryland, Natural Resources Article, §§8-1801 through 8-1817 (creating the Chesapeake and Atlantic Coastal Bays Critical Area Protection Program).

"[p]romot[ing] the conservation of natural resources," and "[p]revent[ing] environmental pollution...." §4.03(b).

Once a local legislative body has zoned or rezoned land under Article 66B, it "may impose additional restrictions, conditions, or limitations that [it] considers appropriate to preserve, improve, or protect the general character and design" of both the property in question and "the surrounding or adjacent lands and improvements." Article 66B, §4.01(c). Additionally, a county may "regulate and restrict, for trade, industry, residences, and other purposes," land use matters such as building size, percentage of a lot to be occupied, off-street parking, and the "location and use of buildings, signs, structures, and land." Article 66B, §4.01(b)(1); *see also* Article 25B, §13 (incorporating Article 25A, §5(T)) (code county has power to enact local laws "relating to ... the erection, construction, repair, and use of buildings and other structures....").[6]

### 2. Kent County Land Use Ordinance

Kent County has adopted a land use ordinance regulating the use of land, buildings, and other structures in each district and authorizing various uses related to seafood operations. Kent County's land use ordinance accordingly aims to "[provide] a unified, comprehensive approach to regulations that affect land use including Zoning, Subdivision, Forest Conservation, Floodplain Management, Sediment and Erosion Control, Stormwater Management, and the Chesapeake Bay Critical Area." Kent County Land Use Ordinance, Article I, §1. For instance, Kent County has designated a Marine District, under which land or structures may be used for "[s]eafood processing, including wholesale and retail sales," by special exception. *See* Kent County Land Use Ordinance, Article V, §13.3(9).

---

[6] Under Article 25B, §13 (incorporating Article 25A, §5(T)), a code county also may "enact local laws enabling the county council to adopt ... ordinances for the promotion of public safety, morals, comfort and welfare, relating to ... streets and highways; the disposal of wastes; ... soil erosion...; [and] the erection, construction, repair, and use of buildings and other structures...." As relevant here, these powers overlap with those granted by Article 66B, and so we do not discuss them separately.

### 3. Effect of §232 on a Code County's Exercise of Land Use Powers

On its face, §232 is self-contained and places limits only on the powers it authorizes. Subsection (a) lists the types of seafood-related operations a county may authorize "[s]ubject to subsection (b)." In turn, subsection (b) sets forth prerequisites for adoption of a measure "under subsection (a)." One of the prerequisites is procedural – notice and a public hearing. The other is substantive – consent of the Secretary. Subsection (b) further provides that failure to comply with the latter prerequisite renders the county's action "void and without legal effect."[7]

Subsection (b) does not state, for instance, that the Secretary's consent must be obtained for county measures "adopted *under Article 66B and* under subsection (a) of this section." Thus, unless one adds words to the statute, §232(b) does not require a county to obtain the Secretary's consent before taking actions under Article 66B or other State statutes, even when those actions might also be authorized by §232(a). For example, the consent provision would not apply to the County's decision to permit by special exception "Seafood processing, including wholesale and retail sales" in the Marine District, *see* Land Use Ordinance Article V, §13.3 (9), because such a decision falls within the County's power to regulate and restrict the "use of buildings, structures, or land" by district. *See* Article 66B, §4.02(a).

So construed, §232 is consistent with other statutes relating to the same subject matter. As noted above, the General Assembly has declared "the policy of this State" that planning and zoning controls

---

[7] It might be argued that only paragraph (b)(1) – which sets out the prerequisites for an action under subsection (a) – is explicitly cross-referenced to subsection (a) and that paragraph (b)(2) – which states the consequences of a failure to obtain the Secretary's consent – is not similarly cross-referenced and therefore has broader application. However, both of these provisions, as well as subsection (c), repeat the same list of possible measures as subsection (a) – "ordinance, resolution, or regulation" – and subsection (c) is also explicitly cross-referenced to action taken under subsection (a). To construe paragraph (b)(2) as untethered to the remainder of the statute with the potential to invalidate an undefined universe of local government measures would be illogical and lead to anomalous results, contrary to the tenets of statutory construction. *Condon v. State*, 332 Md. 481, 491, 632 A.2d 753 (1993).

are to be implemented by local government. *See* Article 25, §5(X)(2)(ii); Article 66B, §4.01(a); *see also Ad + Soil,* 307 Md. at 333 (policy of local implementation is "one of the cornerstones of this state's system of land use control"). That policy would not be furthered by broadly requiring the Secretary to become involved in every land use decision under Article 66B authorizing a seafood business, from the comprehensive plan stage to building design and set-back requirements. Moreover, the consent requirement is not needed to safeguard the Secretary's powers from a county's exercise of its land use powers, which are already constrained by two provisions that expressly preserve State authority. *See* Article 25A, §5(X)(2)(v)(incorporated by Article 25B, §13); Article 66B, §4.01(d) (powers granted under Article 66B do not "[p]reempt or supersede the regulatory authority of any State department or agency under any public general law").

Finally, the legislative history of §232 confirms the apparent meaning of the statute. Section 232 was originally enacted as Senate Bill 671 (2004). The Revised Fiscal and Policy Note for that bill stated that, under the then-current law applicable to the affected county: "Statute does not explicitly state that the county may adopt an ordinance, resolution, or regulation to authorize a person to engage in the seafood industry or harvest seafood."[8] The legislative file for that bill also contains an informal note in which DNR staff advised legislative staff that the amendment of the bill to include the consent provision "takes care of any conflict with our rules or regulations."[9] The legislative history thus does not suggest a legislative intent to give the Secretary new veto powers over actions taken by code counties under their Article 66B powers. Rather, it indicates that the General Assembly intended to grant to the counties powers that had not been expressly granted, and ensure that those powers were appropriately limited to avoid conflict with State law.

In our opinion, the consent provision of §232(b) applies only to measures adopted by a county under §232(a) and should not be

---

[8] As noted in footnote 2 above, later amendments of §232 merely added to the list of counties to which it applied, but did not make other substantive changes. The fiscal notes for those bills refer only to the fact that the county to be added lacked the authority granted by the section.

[9] *See* e-mail message from Gina Hunt to Lesley Cook (April 12, 2004) in legislative bill file for Senate Bill 671 (2004).

construed to either alter the zoning and land use procedures adopted by a county under Article 66B or grant the Secretary authority over land use matters not delegated to that official by other statutes. Thus, in our view, subsections (b) and (c) of §232 simply (1) codify the courts' recognition that State regulation of a certain field will not preempt a local measure which supplements and furthers the State's regulatory scheme and (2) safeguard the State's regulatory scheme by providing a mechanism by which the Secretary may determine in advance whether a local measure in fact meets those criteria.

## II

### County Authority to Limit Common Law Actions Arising out of Seafood Operations

Your second set of questions concerns the County's authority to enact an ordinance, now codified as Chapter 89 of the Kent County Code, that places substantive and procedural limitations on a person's ability to bring a common law nuisance or trespass action against a seafood operation in the County. This law, which is sometimes called a "right to fish" law, is apparently modeled on "right to farm" laws enacted in Maryland, as well as most other states, nearly 30 years ago. A brief excursion into "right to farm" legislation is illuminating in understanding the purpose – and limits – of "right to fish" laws, including Chapter 89. Accordingly, we briefly describe the origin and effect of "right to farm" laws before we address your questions.

### A.    *"Right to Farm" and "Right to Fish" Laws*

Under the common law, the torts of nuisance and trespass are not limited to negligent or intentionally wrongful conduct. Nuisance, "somewhat of a hybrid cause of action, involving property tenets as well as tort principles," is a substantial interference with another's use and enjoyment of land. *Wietzke v. Chesapeake Conf. Ass'n*, 421 Md. 355, 371, 26 A.3d 931 (2011). The tort thus focuses not on the defendant's negligence, but on whether there has been unreasonable interference with the plaintiff's use and enjoyment of property. *WSSC v. CAE-Link Corp.*, 330 Md. 115, 126, 622 A.2d 745 (1993). Trespass also involves property tenets; that tort focuses on the interference with another's exclusive possession of land. *See Rockland, Inc. v. H.J. Williams*, 242 Md. 375, 385, 219 A.2d 48 (1966). A trespass "may be both unintended and non-negligent."

*JBG/Twinbrook Metro Ltd. P'shp. v. Wheeler*, 346 Md. 601, 621, 697 A.2d 898 (1997).

The defenses to nuisance and trespass actions also focus on property rights.[10] In some jurisdictions, the defense of "coming to the nuisance" may bar the claims of a landowner who took possession of the land with knowledge of the activities in question. *See, e.g., Spur Industries v. Del E. Webb Development Co.*, 494 P.2d 700, 706-8 (Ariz. 1972) (en banc). However, many jurisdictions, including Maryland, do not recognize that defense. *See Susquehanna Fertilizer Co. v. Malone*, 73 Md. 268, 280-81, 20 A. 900 (1890).[11]

During the past century, urban and suburban residential developments have expanded into areas formerly dedicated to farming. Many traditional agricultural activities may impact the air and water of adjacent properties in a manner that would ordinarily constitute a common law nuisance or trespass or violate local land use standards. These effects may be exacerbated by some modern agricultural practices. In many jurisdictions there was a perceived need to limit common law torts, as well as to modify local regulatory authority, to support agricultural operations.

To address the possibility that existing agricultural operations might be found liable for common law nuisance and trespass to their

---

[10] A landowner may lose or alienate the rights to exclusive possession and use and enjoyment of property in the same way as other real property rights may be lost or alienated – *e.g.,* by grant or by a prescriptive use conducted openly, hostilely, and under a claim of right for at least 20 years. *See, e.g., Goldstein v. Potomac Electric Power Co.*, 285 Md. 673, 677 n.1, 404 A.2d 1064 (1979) (citing *Susquehanna Fertilizer Co.,* 73 Md. 268, 276, 20 A. 900 (1890)).

[11] In *Susquehanna*, the Court referred to English cases for the proposition that the defense of "coming to the nuisance" applies only when the defendant has acquired a prescriptive right to maintain the nuisance: "... the plaintiff came to the house he occupies with all the rights which the common law affords, and one of them is a right to wholesome air. Unless the defendant shows a prescriptive right to carry on his business in the particular place, the plaintiff is entitled to judgment." 73 Md. at 281 (citations and internal quotation marks omitted). Similarly, in Maryland, the defense of assumption of the risk does not apply to trespass actions. *JBG/Twinbrook*, 346 Md. at 619-21.

new neighbors, states passed "right to farm" laws to protect farmers from liability for common law nuisance and to shield agricultural operations from some local land use regulation. M.R. Grossman & T.G. Fischer, *Protecting the Right to Farm: Statutory Limits on Nuisance Actions Against the Farmer*, 1983 Wis. L. Rev. 95, 97-98; A.A. Reinert, *Note: The Right to Farm: Hog-Tied and Nuisance-Bound*, 73 N.Y.U. L.Rev. 1694, 1695 (1998). Such laws now exist in some form in all 50 states. *Id.*[12] Some "right to farm" laws require that the farm have been in operation for a specified period of time or that it have predated the potential plaintiff's nearby property interest in order to be protected; other laws require that the farm be operated according to certain standards or "generally accepted" standards as a condition of immunity. Reinert at 1710-12. Later laws created administrative bodies to mediate nuisance disputes and required that plaintiffs pursue that remedy as a prerequisite to filing suit. Reinert at 1707-8.

The Maryland General Assembly passed a "right to farm" law in Maryland in 1981. Chapter 763, Laws of Maryland 1981, *codified at* Annotated Code of Maryland, Courts & Judicial Proceedings Article ("CJ"), §5-403. That law provides certain agricultural operations with a qualified immunity from liability for common law nuisance. CJ §5-403(c).[13] The statute also makes a plaintiff's

---

[12] There has been a debate about the extent to which such laws may unconstitutionally deprive the neighbors of an agricultural operation of their own property rights, and at least one court has held that such a law constitutes an unconstitutional taking of property. *See Borman v. Board of Supervisors*, 584 N.W.2d 309 (Iowa 1998).

[13] Although subject to various exceptions and qualifications, the statute confers immunity from common law nuisance claims as follows:

> (c) If an agricultural operation or silvicultural operation has been under way for a period of 1 year or more and if the operation is in compliance with applicable federal, State, and local health, environmental, zoning, and permit requirements relating to any nuisance claim and is not conducted in a negligent manner;

> (1) The operation, including any noise, odors, dust, or insects from the operation, may not be deemed a public or private nuisance; and

prosecution of a nuisance action contingent on exhausting an administrative remedy at the State or local level.  CJ §5-403(e).

Although less common than "right to farm" laws, a "right to fish" law would have a similar design – to protect traditional fishing and seafood operations from liability for common law torts that arise because of a change in the surrounding land use, as well as from local land use regulation.  Such a law would be distinct from one that protects the quiet enjoyment of fishing from intentional interference.  *See, e.g.,* Annotated Code of Maryland, Natural Resources Article ("NR"), §4-506 (prohibiting interference with fishing nets); §4-506.1 (prohibiting intentional interference with a "lawful fishing activity").

As explained in detail below, while Chapter 89 has many of the elements of a "right to fish" law, it lacks the necessary foundation in State law, and §232 did not provide that foundation.

### B.    *Kent County Fish and Seafood Operations Law*

In 2009, the County Commissioners of Kent County enacted an ordinance, now codified as Chapter 89 of the Kent County Code,[14] to stem the decline of the County's fishing and seafood operations "by limiting the circumstances under which commercial seafood and fishing operations that adhere to generally accepted practices may be considered a nuisance or trespass."  Kent County Code, §89-1(B).  The ordinance defines "commercial seafood and fishing operation" to include "all matters of harvesting seafood and charter boat fishing

---

> (2) A private action may not be sustained on the grounds that the operation interferes or has interfered with the use or enjoyment of other property, whether public or private.

CJ §5-403(c).  This provision might apply to some seafood operations; under CJ §5-403(a), the term "agricultural operations" includes aquacultural operations, defined in the Agriculture Article to include rearing fish.  AG §10-1301.  The statute does not apply, however, to fishing and seafood operations generally.

[14] The law was originally enacted as Chapter 80 of the Kent County Code, and was later recodified to maintain the alphabetical order of code chapters.

in Kent County," including a lengthy non-exclusive list of seafood-related operations. §89-2.[15]

Chapter 89 places three constraints on a plaintiff's tort remedies with respect to injuries or damages caused by seafood and fishing operations ("seafood operations"). §89-3. First, it provides that a neighboring property owner of a commercial seafood or fishing operation has "no recourse against the inherent effects" of those operations when they are conducted "within standard and generally accepted seafood and fishing industry practices." §89-3(A).[16] Second, it provides that certain nuisance actions "may not be sustained" with respect to seafood operations "substantially in accordance with generally accepted seafood and fishing industry

---

[15] Included in the list are "boats and patrons leaving and returning at all hours; painting of crab pots; storage of boats with current license, crab pots, oyster tongs, bait, claim rigs, generators, chum, ice trucks, salt, paint, and other equipment; and soft crab shedding with its associated equipment and lighting." §89-2.

[16] That provision reads as follows:

> When conducted within standard and generally accepted seafood and fishing industry practices, neighboring property owners shall have no recourse against the inherent effects of commercial seafood and fishing operations. These inherent effects include, but are not limited to, smoke, noise, vibration, odors, fumes, dust, the operation of machinery of any kind during any twenty-four hour period, movement of equipment or boats, the shedding of crabs, the storage of crab pots, oyster tongs, bait, clam rigs, generators, refrigerators, chum, ice trucks, salt, paint, boats, and other equipment, boats and patrons arriving and leaving at all hours, and the parking and repair of crab pots, and other equipment.

The ordinance defines "generally accepted seafood and fishing industry practices" by reference to federal, state, and local laws regulating those activities and to "best management practices" identified by government agencies. §89-2. It authorizes the county planning department to consult with various organizations and individuals to identify additional practices fitting this standard. *Id.*

practices." §89-3(B).[17]  Finally, the ordinance makes a civil action "alleging that a seafood or fishing operation has interfered with the reasonable use and enjoyment of real property or personal well being" contingent on exhaustion of an administrative procedure created by the ordinance. §89-3(C).[18]

The administrative process to which §89-3(C) refers is set forth in sections 4 and 5 of the ordinance. Section 4 creates the Kent County Seafood Resolution Board ("Resolution Board") to arbitrate and mediate disputes concerning seafood operations in the County. §89-4.[19]  Complaints "of nuisances that allegedly affect the reasonable use and enjoyment of property" are to be filed with the County Department of Planning, Housing and Zoning and, if they also allege "an impact to public health," with the County Health Department. §89-5(A). After the County planning department investigates the complaint, the Resolution Board is to conduct a hearing at which the parties may "examine and cross-examine

---

[17] That provision reads:

> A private action may not be sustained with respect to any seafood or fishing operation conducted substantially in accordance with generally accepted seafood and fishing industry practices on the grounds that the seafood or fishing operation interferes or has interfered with the use and enjoyment of property, whether public or private, if the seafood or fishing operation has been in existence at the site for at least one year and such operation was not a nuisance at the time it began operation.

[18] That provision reads:

> Notwithstanding any provision of this section, no action alleging that a seafood or fishing operation has interfered with the reasonable use or enjoyment of real property or personal well being may be filed in the Court if the plaintiff has not sought and obtained a final judgment of the Kent County Seafood Resolution Board.

[19] The Resolution Board is a five-member body appointed by the Commissioners with "the power to issue subpoenas for the presence of witnesses, the production of evidence, or both." §89-4(B).

witnesses" and present other information. §89-5(B), (C)(1)-(2). The Resolution Board is then to decide whether a particular practice conforms to generally accepted industry practices. §89-4(A). The ordinance provides:

> The [Resolution] Board's decision in this respect creates a rebuttable presumption which shall be admissible in evidence in any subsequent civil proceeding in the Kent County District or Circuit Court arising out of the matters set forth in the complaint.

§89-5(C)(3). The ordinance further provides that the Resolution Board's decision "may be appealed in the Kent County Circuit Court in accordance with Title 7, Chapter 200 of the Maryland Rules." §89-5(C)(5). Absent an appeal, the "decision shall be final." *Id*.

Finally, the ordinance requires plats for subdivisions approved within the Chesapeake Bay Critical Area or abutting an existing seafood or fishing operation to contain an acknowledgment that the County has enacted Chapter 89 and that "owners of lots in the subdivision may be subject to inconveniences arising from such operations." §§89-6, 89-7.

### C. *Whether a Code County May Limit Tort Actions Related to Seafood Operations*

You ask whether Kent County had the power to enact the Chapter 89 limitations on nuisance and trespass actions in 2009, before §232 applied to Kent County. In our opinion, Kent County did not have that power in 2009, nor did §232 confer it.

#### 1. Authority of a Code County with Respect to Common Law Tort Actions

An enactment of a county legislative body not only must fall within a legislative field delegated by the State Constitution or statutes pertinent to that county's method of government, but also must also fit the definition of a "local law." *See McCrory Corp. v. Fowler*, 319 Md. 12, 20, 570 A.2d 834 (1990) (charter county's ordinance fell within a legislative field eligible for county regulation but did not address purely local matters); *Gunpowder Horse Stables v. State Farm Auto. Ins. Co.*, 108 Md. App. 612, 632-33, 673 A.2d 721 (1996) (same). The answer to your question turns on whether

the provisions of the Kent County ordinance that relate to common law tort actions satisfy the "local law" requirement.[20]

### a. *"Local Law"*

The Code Home Rule Amendment grants a code county the general power to "enact, amend, or repeal a public local law...." Maryland Constitution, Article XI-F, §3; *see also* Article XI-F, §6 (code county "may enact, amend, or repeal a public local law of that county by resolution of the board of county commissioners...."). The term "public local law" excludes (and so a code county may not enact) "laws applicable to more than one county," and certain other laws not relevant here. *See* Article XI-F, §1.

The "local law" constraint also applies to charter and commissioner counties. *See* Article XI-A, §4 (pertaining to a charter county's powers); *Bradshaw v. Lankford*, 73 Md. 428, 432, 21 A. 66 (1891) (explaining that the General Assembly, not county commissioners, had been vested with the power to address subjects of concern to the people of the State). Most cases concerning the "local law" requirement have arisen in the context of a charter county's powers, *see, e.g.*, *Holiday Universal, Inc. v. Montgomery County*, 377 Md. 305, 314, 833 A.2d 518 (2003), and the courts have relied on those cases to decide whether laws enacted by other types of local governments are "local" in effect. *See Cole v. Secretary of State,* 249 Md. 425, 431-32, 240 A.2d 272 (1968) (addressing whether a statute pertaining to Cecil County, a commissioner county, was "local"); *Board of Education v. Frederick*, 194 Md. 170, 182, 69 A.2d 912 (1949) (addressing whether a municipality's law was "local"); *Annapolis v. Wimbleton, Inc.*, 52 Md. App. 256, 263, 447 A.2d 509 (1982) (same).

A law is not "local" when it "affects the interests of the people of the whole State." *Gaither v. Jackson*, 147 Md. 655, 667, 128 A. 769 (1925). A law that regulates conduct or people in other counties is thus not local. *See, e.g. Holiday Universal, Inc. v. Montgomery County*, 377 Md. 305, 317, 833 A.2d 518 (2003) (county regulation

---

[20] In light of our answer to the "local law" question, we do not discuss the constitutionality of the Chapter 89 immunity provisions. *See Jackson v. Dackman*, __ Md. __, 30 A.3d 854, 2011 Md. LEXIS 639, *35-41(discussing the constitutionality of certain statutory immunities in light of Article 19 of the Maryland Declaration of Rights).

of service contracts). Nor is a law that addresses a subject of significant interest throughout the State. One such subject is the creation of a judicial remedy for the statewide problem of employment discrimination. *See McCrory Corp.*, 319 Md. at 20; *see also Edwards v. Corbin,* 379 Md. 278, 296, 841 A.2d 845 (2004). Another is the State's natural resources. *See, e.g.*, *Bradshaw v. Lankford,* 73 Md. 428, 21 A. 66 (1891) (county prohibition on oyster dredging in State waters within the county was not a "local law"). Conversely, a law pertaining only to a county's employees, having no effect outside of the county, and not creating a cause of action in the courts, is a "local law." *Tyma v. Montgomery County*, 369 Md. 497, 514, 801 A.2d 148 (2002) (county extension of county benefits to domestic partners of county employees).

Changes to common law causes of action are not "local" in nature. *See, e.g., McCrory*, 319 Md. at 19-21; *Gunpowder Horse Stables*, 108 Md. App. 612. In *McCrory*, a Montgomery County ordinance sought to address employment discrimination by creating a cause of action cognizable in circuit court. 319 Md. at 19-21. The Court of Appeals found that the field of abusive employment practices, albeit "a statewide problem," had not been preempted by the State and could be addressed concurrently by home rule counties. Nevertheless, the fact that a home rule county could address the problem did not mean that the county could create a judicial remedy: "[C]reating a remedy which has traditionally been the sole province of the General Assembly and the Court of Appeals, to combat a statewide problem such as employment discrimination, goes beyond a matter[] of purely local concern."[21] *Id.* at 20 (citation and

---

[21] In *McCrory,* the Court focused on whether the law was "local" rather than whether regulating common law causes of action fell within the express powers delegated to a charter county. Prior to *McCrory*, the Court had held that a charter county could alter the common law by creating a commission empowered to grant remedies for violations of the county's fair housing law. *County Council v. Investors Funding*, 270 Md. 403, 312 A.2d 225 (1973). In that case, the Court reasoned that the police powers granted to charter counties (but not code counties) by Article 25A, §§5(A) and (S) included the enactment of legislation to address landlord-tenant issues and thus necessarily included the power to alter the common law. The Court did not address the question of whether such laws were "local" – an issue apparently not raised in that case. The Court also did not address whether the charter county's express powers included

(continued...)

quotation marks omitted). In explaining its reasoning, the Court offered the example of a hypothetical county ordinance abolishing a common law defense:

> A contrary holding would open the door for counties to enact a variety of laws in areas which have heretofore been viewed as the exclusive province of the General Assembly and the Court of Appeals. For example, could a county ordinance authorize in the circuit court and the District Court negligence actions in which contributory negligence would not be a bar? Could a county ordinance provide for breach of contract suits upon "contracts" not supported by consideration, or where the parol evidence rule is inapplicable? We believe that the answer is "no." These, and many other legal doctrines, are matters of significant interest to the entire State, calling for uniform application in state courts. They are not proper subject matters for "local laws."

*Id.* at 20-21; *see also H. P. White Lab. v. Blackburn*, 372 Md. 160, 169-70, 812 A.2d 305 (2002) (creation of judicial remedy exceeded charter county's powers).

In *Gunpowder Horse Stables*, Baltimore County had attempted to legislate a form of strict liability for actions involving injuries caused by domestic animals. 108 Md. App. 612. Under the ordinance at issue in that case, an owner of a domestic animal would incur liability for such injuries without regard to the owner's negligence or knowledge of the animal's propensities. *Id.* at 626.

---

[21] (...continued)
the power to alter the common law on torts; in fact, the ordinance in question, codified then as 1972 Montgomery County Code 29-46, expressly provided that the availability of remedies through the commission procedures had no effect on a person's recourse to the remedies in court. *See also Gunpowder*, 108 Md. App. at 631 (explaining that *Investors* "did not involve a new cause of action"). In any event, after *Investors*, the courts addressing new judicial causes of action have focused on the relatively concrete "local law" requirement rather than the more abstract inquiry of whether judicial remedies fall within a county's substantive legislative jurisdiction. *See, e.g., Edwards*, 379 Md. 278.

The court noted that the ordinance made the plaintiff's burden of proof "less rigorous than under common law negligence or strict liability" and thus "create[d] an alternative and new cause of action." The court then found that, while the regulation of animals in the county was a matter for local laws, the creation of a remedy was not:

> We do not call into question Baltimore County's authority to regulate animals and matters related to their presence within its borders pursuant to Article XI-A and the Express Powers Act. As *McCrory* unequivocally states, however, a county may not create a new cause of action between private parties concerning matters of statewide concern.
>
> The common law of Maryland recognizes only two causes of action against an owner of a domestic animal: negligence and strict liability. Unlike the Ohio and Massachusetts statutes noted previously, [the county ordinance] was not enacted by the State's legislative body. If we were to uphold [the ordinance], we would be placing our imprimatur on a theory of liability not recognized by the General Assembly or the common law. Additionally, it would be a theory of liability selectively and rarely imposed.

*Id.* at 633.

In short, the elements of, and defenses to, a common law cause of action are matters affecting the people of the State generally and, as with the conduct of persons outside a county's geographical boundaries, are not subject to local government regulation.[22]

---

[22] This Office has consistently advised that changes to common law causes of action are not properly the subject of local laws. *See* Letter of Assistant Attorney General Kathryn M. Rowe to Senator Richard F. Colburn (March 8, 2004) (advising that "to the extent that" 2004 Senate Bill 671 would create new tort defenses, it would not be "a matter for local

(continued...)

### b. *Whether the Kent County Fish and Seafood Operations Law is a Local Law*

In an express departure from the common law, Chapter 89 seeks to "[l]imit the circumstances under which commercial seafood and fishing operations that adhere to generally accepted practices may be considered a nuisance or trespass." §89-1(B). To achieve that objective, it provides that "neighboring property owners shall have *no recourse*" against "the inherent effects" of a commercial seafood and fishing operation "conducted within standard and generally accepted ... industry practices." §89-3(A) (emphasis added). Chapter 89 would require dismissal of an action for "the interference of use and enjoyment of property" when the defendant has conducted the operation "substantially in accordance with generally accepted seafood and fishing industry practices" at the site for at least one year and "such operation was not a nuisance at the time it began operation." §89-3(B).

As noted earlier, under the common law, neither trespass nor nuisance requires a property owner to prove a breach of a standard of care. Rather, each of these torts involves an interference with a property interest. By conditioning a plaintiff's "recourse" on proof of a breach of a standard of care, Chapter 89 would remove strict liability nuisance and trespass from the remedies available to neighboring property owners. Stated another way, it would grant immunity to defendants from such claims. Like the ordinance in *Gunpowder Horse Stables,* it states "a theory of liability not recognized by the General Assembly or the common law." 108 Md. App. at 633. Accordingly, §89-3 exceeds the local law constraint on the County's legislative powers.

Chapter 89 also purports to affect the defenses to common law nuisance and trespass actions. It shortens the 20-year period for the acquisition of a prescriptive nuisance to one year and confers immunity on certain operations conducted for that period and in conformity with the standard of care of the industry. And, through

---

[22] (...continued)
laws"); *see also* Letter of Assistant Attorney General Craig A. Nielsen to Edward A. Hammond, Jr., Attorney for County Commissioners of Worcester County (October 20, 1998) (advising that a code county lacked the authority to legislate on defenses to nuisance actions arising out of agricultural operations).

the notice provisions in §§89-6 and 89-7, it enables a defendant to assert the defense that the plaintiff "came to the nuisance" – a defense not recognized in Maryland. All three propositions state theories not recognized in the common law and exceed the County's authority to enact "local laws."

In sum, the limitations that Chapter 89 places on trespass and nuisance actions address matters of statewide concern. Accordingly, the provisions of that ordinance concerning common law tort actions are not properly part of a "local law" within the County's legislative powers.

### 2. Effect of §232 on a County's Authority Concerning Common Law Torts

As outlined in Part I.A of this opinion, as of October 1, 2011, State law provides that Kent County "may adopt an ordinance, resolution, or regulation or take any other action that the governing body considers necessary to authorize a person to [engage in certain activities relating to a seafood business] and [h]arvest seafood." Article 25, §232(a). We turn to the question whether the power to "authorize" seafood operations under §232 includes the power to grant immunity to seafood operations that cause private nuisances or trespasses.

#### a. *Statutory Language*

Again, the words of the statute, when unambiguous on their face and in context, control. That canon of statutory construction is particularly forceful here in light of the "long-standing rule of statutory interpretation that the common law will not be repealed by implication." *Suter v. Stuckey*, 402 Md. 211, 232-33, 935 A.2d 731 (2007). Under that rule, "[a] statute is 'not presumed to repeal the common law further than is expressly declared, and ... a statute, made in the affirmative without any negative expressed or implied, does not take away the common law.'" *Id.*[23]

---

[23] The presumption against a repeal of the common law is based on the statement in Article 5 of the Maryland Declaration of Rights that a person is entitled to the common law, except as modified by the Legislature. *Arundel Corp. v. Marie*, 383 Md. 489, 502-3 n.5, 860 A.2d 886 (2004).

On its face, §232 merely delegates to a county the power to authorize seafood operations. It does not authorize conduct that otherwise constitutes a trespass or nuisance; in fact, it does not address common law remedies at all. Under Maryland law, "[t]he delegation of a power to do an act, whilst conferring full authority to perform the act itself, does not, therefore, without more, essentially and without exception, carry the right to so do it as to inflict loss or injury upon an innocent individual." *Taylor v. Baltimore*, 130 Md. 133, 144-45, 99 A. 900 (1917) (city's authority to construct sewage treatment plant did not include authority to operate it as a nuisance); *see also WSSC v. CAE-Link*, 330 Md. at 128-29 (federal court's order to the defendant to construct sewage sludge composting facility in a certain county did not include power to operate it as a nuisance); *cf. Evans v. Burruss*, 401 Md. 586, 610, 933 A.2d 872 (2007) (the right to conduct a private nuisance is "not a normal element of rights arising out of the issuance of building permits"). In simply making the delegation of power expressed in §232, the General Assembly did not authorize a county to deprive a person of common law remedies for interference with that person's property rights.

### b. Comparison to "Right to Farm" Legislation and other Laws

A comparison to other statutes pertaining to county powers and tort immunities is instructive. As noted in Part II.A above, the Legislature created an express limited immunity for nuisances arising out of certain agricultural operations operated in conformance with the applicable laws and standard of care. CJ §5-403. That statute explicitly declares certain effects of farming, including "any sight, noise, odors, dust, or insects," not to be nuisances in certain circumstances and also provides that "[a] private action may not be sustained on the grounds that the operation interferes or has interfered with the use or enjoyment of other property...." *Id.* The Legislature has created a similar exclusion for agricultural operations in defining the powers of the Secretary of Health and Mental Hygiene with respect to statutorily-defined nuisances. *See* Annotated Code of Maryland, Health-General Article ("HG"), §20-301 *et seq*. While that statute defines "nuisance" generally as "a condition that is dangerous to health or safety," it expressly excludes from the definition "any condition resulting from a farm operation following generally accepted agricultural practices

that are not creating a condition dangerous to health or safety."  HG §20-301(a)-(b).[24]

These statutes show that when the Legislature wishes either to create immunity from liability for common law torts, or to exclude the effects of certain activities from the definition of a "nuisance," it does so expressly and not by implication.[25]  In contrast, §232 does not modify the common law on nuisance by excluding certain effects and operations; does not state that a private action "may not be sustained" for the interference with the use or enjoyment of other property; does not authorize counties to allow a properly conducted operation that creates a private nuisance; does not define the term "nuisance" specially; and, in fact, does not mention nuisance at all. The Legislature has not elsewhere created  immunity for seafood operations conducted in accordance with industry practices.[26]  And

---

[24] The Legislature has also created a program, the Maryland Agricultural Land Preservation Foundation ("MALPF"), that encourages the passage of local measures to support "normal" agricultural activities. MALPF was established to purchase easements to preserve the use of land in the State for agricultural purposes.  Annotated Code of Maryland, Agriculture Article ("AG"), §2-501  *et seq.*  The availability of that program in a particular county is conditioned on the existence of county regulations providing that "[a]ll normal agricultural operations performed in accordance with good husbandry practices which do not cause bodily injury or directly endanger human health are permitted, including, but not limited to, sale of farm products...."  AG §2-513(a)(3); *see also* State Finance and Procurement Article, §5-408(f) (conditioning MALPF's purchase of an agricultural easement on the affected county's adoption of a comprehensive plan that "describes ... the ordinance, regulations, and procedures the county is using ... to support the ability of working farms to engage in normal agricultural and forestry activities ....").  There is no analogous program for land used for seafood operations.

[25] The Legislature has also enacted specific tort immunities for other entities and persons. *See, e.g.*, CJ §5-403.1 (sport shooting ranges), CJ §5-415 (common carrier carriers refusing to deliver bee colonies), CJ §5-417 (corporate directors), CJ §5-424 (veterinarians), CJ §5-804 (owners of caves.  *But see Jackson*, 2011 Md. LEXIS 639, *43 (invalidating statutory immunities in certain lead paint cases under Article 19 of the Maryland Declaration of Rights).

[26] Seafood operations are addressed by various provisions in the Agriculture Article, *see, e.g.*, AG *§10-1001 et seq.* regarding seafood

(continued...)

§232, given the plain meaning of its text, does not provide the basis for a county to enact one.

### c.    *Legislative History*

The legislative history of §232 confirms our view that it does not empower a county to repeal the common law on nuisance.   As noted in Part I.C.3 of this opinion, §232 was introduced in 2004 as Senate Bill 671.  If enacted in its original form, that bill would have authorized Dorchester County to "adopt an ordinance, resolution, or regulation or take any other action that [it] considers necessary to protect a person's *right* to harvest seafood" (emphasis added).

In responding to a question about Senate Bill 671 relating to the General Assembly's power to enact legislation pertaining to one county, this Office advised that it understood the bill to be "aimed at recent instances in which persons [who] have recently moved to the county have objected to traditional seafood harvesting practices as nuisances or as otherwise adversely impacting on their property rights."  Letter of Assistant Attorney General Kathryn M. Rowe to Senator Richard F. Colburn (March 8, 2004).  The letter further stated, "The bill is intended to permit the County to adopt an ordinance along the lines of those that have been adopted in various counties to protect the right to farm."  *Id.*[27]  That understanding is confirmed by a drafter's note in the bill file stating, "Model bill after HB 143 - 'St. Mary's County Right to Farm....'"  House Bill 143(2002), in similar language, would have granted a county the power to take measures to "authorize" agricultural operations.  However, the grant of authority in the first reader of Senate Bill 671

---

[26] (...continued)
marketing, and the Natural Resources Article.  With the exception of the immunity for aquacultural operations granted in CJ §5-403, *see* footnote 13 above, the Code does not contain immunity provisions analogous to those applicable to agricultural operations.

[27] The advice letter advised that the legislation, if passed, would not intrude upon the express powers granted to Dorchester County, a charter county, by Article 25A, §5A, insofar as it addressed nuisance remedies, because they were a matter of State concern not within a charter county's express powers.  Therefore, the legislation comported with Article XI-A of the State Constitution, which prohibits the General Assembly from enacting a public local law for a charter county on a subject within the express powers of the county.

lacked the substantive immunity provisions underpinning the "right to farm" bill.

As it progressed through the General Assembly, Senate Bill 671 was significantly amended. As a result of those amendments, all references to a "right to harvest seafood" and to the protection of such a right were deleted from the bill. The bill was amended to broaden the range of seafood-related activities on which Dorchester County could act, to require the consent of the Secretary of Natural Resources to actions taken under the act, and to expressly provide that, in case of conflict, State and federal laws would preempt the county's laws and actions.

As described above, during its 2011 regular session, the General Assembly enacted Chapter 385 to extend §232 to every county. As introduced, the 2011 bill would have been enacted

> [for] the purpose of expanding the application of certain provisions to authorize counties to adopt a certain ordinance, resolution, or regulation relating to *the right* to engage in the seafood industry and to harvest seafood ...; and generally relating to the authority of the governing body of a county to authorize a person to engage in certain activities related to the seafood industry and to harvest seafood.

House Bill 1240 (first reading, February 21, 2011) (emphasis added). As in 2004, the General Assembly amended the bill to delete any reference to a "right" to harvest seafood or engage in the industry. The General Assembly thus chose not to declare for seafood operations a "right" that would necessarily take priority over the rights of others to the use and enjoyment of their property.[28]

---

[28] The fiscal notes for the 2007 and 2008 amendments of §232, which merely extended the statute to additional counties, contain facts on the importance of the seafood industry to those counties, but do not otherwise address tort immunity. *See, e.g.,* Fiscal and Policy Notes for House Bill 54 (2007) and House Bill 1493 (2008). The sponsor of House Bill 1493 (2008), however, believed that adding Calvert County to the list would enable it to enact an ordinance to "protect the watermen from nuisance suits brought by newly arrived neighbors." (April 1, 2008, Letter of Delegate Sue Kullen to the House Education, Health, and

(continued...)

### *d.    Summary*

The plain language of §232, especially when viewed in the context of the right to farm statutory scheme, the General Assembly's deletion of any reference to a "right" to fish from the legislation, and the presumption against repeals of common law remedies, does not authorize a county to limit those remedies.

### D.    *Whether Decision by Resolution Board can be a Prerequisite to a Civil Action*

In addition to setting substantive limitations on tort actions, Chapter 89 also purports to modify the procedural and evidentiary rules that apply to such actions.  It provides that, before filing in court an "action alleging that a seafood or fishing operation has interfered with the [plaintiff's] reasonable use or enjoyment of real property or personal well being,"  a plaintiff must obtain a "final judgment" of the Resolution Board on whether the defendant's "practice does or does not conform to generally accepted practices." §89-3(C).  The ordinance further provides that the Board's decision, once final, "creates a rebuttable presumption  ... admissible in evidence" in a subsequent civil proceeding in the circuit court or District Court in Kent County.  §89-5(C).  You asked whether a code county may condition the filing of a civil action on the issuance of an administrative decision by a county board and require the courts to accord that decision a presumption of correctness.

#### 1.    Requirement that a Plaintiff Obtain a Resolution Board Decision

The requirement that a plaintiff obtain a decision from an administrative body as a prerequisite to filing suit essentially creates an administrative exhaustion requirement for access to the courts. We need not decide whether this requirement would be analyzed as

---

[28] (...continued)
Environmental Affairs Committee.)   As discussed above, the plain language of §232 as it was ultimately enacted, especially viewed in the context of the right to farm statutory scheme and the presumption against repeals of common law remedies, does not effectuate that intent.

an element of subject matter jurisdiction[29] or under the rubric of primary jurisdiction.  In either event, it is neither a local law nor within the substantive powers granted to a code county.  Statutes pertaining to agricultural operations again illustrate the way in which the Legislature delegates such power when it chooses to do so.

With respect to subject matter jurisdiction in circuit court, the State Constitution establishes a circuit court in each county, with the jurisdiction existing at the time of adoption of the Constitution and "the greater or lesser jurisdiction hereafter prescribed by law." Maryland Constitution, Article IV, §20.  The General Assembly has regulated the circuit courts' jurisdiction through a number of enactments.  Under CJ §1-501, each circuit court "has full common-law and equity powers and jurisdiction .... and all the additional powers conferred by the Constitution and by law, except where by law jurisdiction has been limited or conferred exclusively upon another tribunal."  For instance, the General Assembly has "by law" conditioned a person's right to file a nuisance action against "an agricultural operation" on the filing and disposition of a complaint with any local agency "authorized to hear a nuisance complaint against an agricultural operation," or, in the absence of such an agency, with the Agriculture Department's mediation program.  CJ §5-403(e); *see also* AG §§1-1A-01 *et seq*. (requiring the Agriculture Secretary to establish a mediation program for "agriculturally related disputes").  The Health Claims Arbitration Act similarly conditions the filing of a claim for a medical injury on certain procedures.  CJ §3-2A-01 *et seq.; see also Jackson,* 2011 Md. LEXIS 639, *36-39 (distinguishing between conditions validly placed by the Legislature on access to the courts and the denial of that access in violation of Article 19 of the Maryland Declaration of Rights).  By contrast, the General Assembly has not placed conditions on circuit court jurisdiction over common law tort actions involving seafood operations.

With respect to subject matter jurisdiction in the District Court, the State Constitution provides: "[t]he District Court's jurisdiction shall be uniform throughout the State."  Maryland Constitution, Article IV, §41A.  If the County's administrative exhaustion

---

[29] *See Maryland-National Capital Park & Planning Comm'n v. Crawford*, 307 Md. 1, 13-14, n.4, 511 A.2d 1079 (1986) (exhaustion of remedies requirement often treated as a jurisdictional issue, although it is not a limitation on subject matter jurisdiction of a trial court).

requirement were interpreted to apply statewide, it would not be a local law. If it were interpreted only to apply to filings with the District Court in Kent County, it would be invalid because the District Court's jurisdiction would not be uniform throughout the State. Either way, the District Court's jurisdiction is not a local matter. While the Legislature has expressly granted a code county the authority to designate the violation of a county ordinance as a "civil infraction" triable in the District Court, *see* Article 25B, §13C, it has not delegated such authority over common law tort actions.

The requirement to obtain an administrative decision could also be viewed as a matter of primary jurisdiction. The Court of Appeals has described that concept as follows:

> "Primary jurisdiction"... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*Arroyo v. Board of Education of Howard County*, 381 Md. 646, 658, 851 A.2d 576, 583-84 (2004) (quoting *United States v. Western Pacific R. Co.*, 352 U.S. 59, 63-64 (1956)). By adopting Chapter 89, the County has attempted to place the resolution of one issue – a defendant's operation in accordance with the industry's accepted practices – "within the special competence of an administrative body" and to suspend the judicial process in the interim. As explained above, however, the regulation of a person's common law nuisance and trespass actions lies beyond a code county's authority to enact local laws and thus beyond a county agency's primary jurisdiction.[30]

---

[30] A code county may well have the authority to appoint a resolution board as a voluntary resource for parties that wish to resolve a dispute. *See* Article 25B, §13, incorporating Article 25A, §5(T) (authorizing code counties to enact ordinances for "the protection and promotion of public .... welfare" relating to subjects such as waste disposal and the use of streets and structures); *see also* 62 *Opinions of the Attorney General* 275, 306-08 (summarizing the scope of code counties' powers).

### 2. **Evidentiary Presumption Concerning Resolution Board Decision**

A rebuttable presumption is an evidentiary rule. *See Carrion v. Linzey*, 342 Md. 266, 278-80, 675 A.2d 527 (1996)(presumption in the Health Claims Arbitration Act); *Attorney General v. Johnson*, 282 Md. 274, 385 A.2d 57 (1978), *appeal dismissed*, 439 U.S. 805 (1978), *overruled on other grounds by Newell v. Richards*, 323 Md. 717, 729, 594 A.2d 1152 (1991). The Constitution assigns to the Court of Appeals the power to "adopt rules ... concerning the practice and procedure" in the courts. Maryland Constitution, Article IV, §18(a); *see also* CJ §1-201. Those rules "have the force of law until rescinded, changed or modified" by the Court or "otherwise by law" – a phrase that refers to State law, not county enactments. *See Hauver v. Dorsey*, 228 Md. 499, 502, 180 A.2d 475 (1962).

Title 5 of the Maryland Rules contains the Court's evidentiary rules; they apply to "all actions and proceedings in the courts of this State," with the exception of twelve types of proceedings, not including tort actions. Maryland Rule 5-101; *see also* Maryland Rule 1-101(e) (Title 5 "applies to all actions in the courts of this State, except as otherwise provided by rule or statute"). None of the rules would accord special weight to a decision of the Resolution Board. The General Assembly has created evidentiary rules and presumptions in various statutes; but have found no statute that would require a court to give special weight to a decision of the Resolution Board.

Neither the Maryland Constitution nor the General Assembly has granted to a code county the power to regulate the admissibility of evidence in the courts. Indeed, local variations of court rules have largely been abolished. A circuit court may only adopt local rules on five subjects (memorial proceedings, auditors, certain trustees' compensation, certain bail bond matters); pleadings and evidence are not among them. Maryland Rule 1-102. The District Court was created as a unified court with uniform statewide jurisdiction precisely to eliminate the "gallimaufry" of lower court procedures that had existed in each political subdivision. *See State v. Smith*, 305 Md. 489, 494, 505 A.2d 511 (1986).

In short, the evidentiary presumptions applicable to common law actions are subject to modification by the Judiciary and the Legislature, but not by local governments. Accordingly, in our view,

Kent County lacks authority to create presumptions concerning the weight and admissibility of a Resolution Board decision.[31]

### 3. Summary

In our opinion, a code county lacks the power either to impose conditions on a plaintiff's access to the courts or to regulate the admissibility and weight of evidence in a common law action in the courts. In both cases, the short answer is that those provisions would not be a local law within the power of the county.

### III

### Conclusion

For the reasons set forth above, our opinion is as follows:

1. Section 232 adds "seafood business" and "seafood harvesting" to the subjects on which counties may legislate. However, it does not empower a county to enact legislation that would otherwise be preempted by State laws and regulations. Rather, it provides the county and the Secretary with a mechanism by which to determine whether proposed county legislation would likely be preempted by the laws, regulations, and program guidance administered by the DNR.

2. The §232 requirement that the Secretary consent to county measures applies only to actions taken by a county under that statute. Section 232 does not require a code home rule county to obtain the consent of the Secretary before exercising its powers to regulate land use under Annotated Code of Maryland, Article 66B.

---

[31] Chapter 89 provides that the presumption of correctness attached to a Resolution Board decision would apply in the District Court in, and the Circuit Court for, Kent County. §89-3(C)(3). Even if construed to apply only in those courts, the provision would likely fall afoul of the local law requirement. *See Holiday*, 377 Md. at 317. The District Court is a statewide court, and, while venue in a trespass action would only lie in Kent County, CJ §6-203(b)(iv), a nuisance action against a non-resident individual, a corporation with its principal office elsewhere, certain multiple defendants, and certain other defendants could be brought in another county. CJ §§6-201 and 6-202(11).

3.    Neither the Maryland Constitution nor other State law confers on a code home rule county the authority to enact "right to fish" legislation that restricts the filing of common law trespass and nuisance actions.  Although the General Assembly has expressly repealed aspects of those common law torts as against agricultural operations, it has not done so for seafood operations.  Section 232 did not authorize the passage of local "right to fish" laws.

4.    Neither the Maryland Constitution nor other State law confers on a code home rule county the authority to impose conditions on a person's access to a judicial remedy for common law torts arising out of the conduct of a seafood operation.   A code county also lacks the authority to create evidentiary presumptions for such an action.

Douglas F. Gansler
*Attorney General*

Ann MacNeille
*Assistant Attorney General*

Robert N. McDonald
*Chief Counsel*
  *Opinions and Advice*

J. JOSEPH CURRAN, JR., *Attorney General*

CARMEN M. SHEPARD

DONNA HILL STATON

*Deputy Attorneys General*

CRAIG A. NIELSEN
*Assistant Attorney General*
*Counsel to the*
*Department of Agriculture*

THOMAS F. FILBERT
*Assistant Attorney General*



## THE ATTORNEY GENERAL

DEPARTMENT OF AGRICULTURE
50 HARRY S. TRUMAN PARKWAY
ANNAPOLIS, MARYLAND 21401
(410) 841-5883
Facsimile (410) 841-5914

October 20, 1998

Edward H. Hammond, Jr., Esquire
Attorney For Worcester County
Williams, Hammond, Moore,
 Shockley & Harrison, L.L.P.
3509 Coastal Highway
Ocean City, Maryland 21842

Dear Mr. Hammond:

I am responding to your request for advice, addressed to Jack Schwartz former Chief Counsel for Opinions and Advice, on behalf of the County Commissioners of Worcester County on a proposed "right to farm" law. The county plans to protect local farmers against nuisance law suits by creating a local agency to hear complaints and by restricting nuisance claims in a court. [1]

The proposal you question includes the creation of an Agricultural Reconciliation Committee with the authority to hear and issue binding decisions over nuisance complaints against agricultural operations. A typical common law nuisance action would be prohibited in any court against any agricultural operation in Worcester County that is "conducted substantially in accordance with generally accepted agricultural management practices." After first obtaining a "final judgment" from the reconciliation committee, any dissatisfied party would be entitled to a de novo appeal to the circuit court, thereby bypassing the district court, on any nuisance complaint. You are concerned that the county may not have the authority to adopt this proposal.

For the following reasons, it is my view that as a code home rule county, Worcester County:

1.     lacks the authority to change the common law nuisance definition and create a different cause of action for a court to consider; I believe this change may be made by the General Assembly but not by the county;

---

[1] You stated that a formal opinion is not needed.

2.     has the authority to create an agency without judicial powers to arbitrate and mediate disputes on matters of local concern involving nuisance complaints against agricultural operations; however, the county lacks authority to prevent a person from filing a nuisance complaint in the district court.

## The Limit of Code Home Rule

Under code home rule, Article XI-F of the Maryland Constitution, Worcester County's legislative authority is limited to enacting "public local laws" on matters of local concern. Article XI-F §3 grants a code county general authority to "enact, amend, or repeal a <u>public local law</u> of that county." (emphasis supplied). Also, by Article 25B §13 of the Annotated Code, the General Assembly granted code counties additional powers to pass public local laws. (This authority includes all matters in "§3 of Article 25, in subtitle "Draining Lands" of Article 25, and in §5 of Article 25A, except for subsection (A), (P) and (S) of §5 of Article 25A"). Article XI-F §1 defines "public local law" as follows:

> " '[P]ublic local law' means <u>a law applicable to the incorporation, organization, or government of a code county and contained in the county's code of public local laws; but this latter term specifically does not include</u> (i) the charters of municipal corporations under Article 11E of this Constitution, (ii) the laws or charters of counties under Article 11A of this Constitution, (iii) laws, whether or not Statewide in application, in the code of public general laws, (iv) <u>laws which apply to more than one county</u>, and (v) ordinances and resolutions of the county government enacted under public local laws."

(emphasis supplied).

While a county has board authority to legislate over local matters, our office has concluded that none of the provisions of Article XI-F permit the county to enact a public local law on matters of state concern. 64 <u>Opinions of The Attorney General</u>, 110, 112 (1979), ("Code counties may enact legislation on "matters of local concern" and not "matters either wholly or partly of concern to the State"); 62 <u>Opinions of The Attorney General</u>, 275; 286-300 (1977) (for legislative authority of code counties).

## The County's Authority to Alter Common Law Remedies

In my opinion, the County may not alter a common law nuisance remedy because this is a matter of state concern that is beyond the county's legislative powers. By the following language, the Worcester County proposal alters the common law and seeks to restrict a litigant's common law nuisance action in a court:

<u>A private action may not be sustained</u> with respect to an agricultural

operation conducted on agricultural land on the grounds that the agricultural operation interferes or has interfered with the use or enjoyment of property, whether public or private, if the agricultural operation was, at the time the interference is alleged to arise, conducted substantially in accordance with generally accepted agricultural management practices.

(emphasis supplied).

For a common law nuisance definition, see Hoffman v. United Iron, 108 Md. App. 117, 133 (1996). (At common law, "[v]irtually any disturbance of the enjoyment of the property may amount to a nuisance so long as the interference is substantial and unreasonable and such as would be offensive or inconvenient to a normal person").

The question of whether local legislation is a matter of "local concern" or "concern to the state" and is beyond the power of a county to legislate, is determined on a case-by-case basis; In McCory Corp. v. Fowler, 319 Md. 13, 20 (1990) the Court of Appeals held that Montgomery County was precluded from adopting a local law that created a new common law tort action for abusive employment practices because the subject matter was of state concern, requiring uniform application. Because this traditionally has been "viewed as the exclusive province of the General Assembly and the Court of Appeals", the Court concluded that a county could not alter the legal principles of a common law tort action in the district or in the circuit court. Id. at 21, ("Could a county ordinance authorize in the circuit court and the District Court negligence actions in which contributory negligence would not be a bar? . . . we believe the answer is "no"). [2]

Worcester County may legislate on a variety of matters of local concern but cannot alter the tort of nuisance against an agricultural operation. Under the county's home rule powers, there is no specific authority to alter common law nuisance remedies in a court. Nuisance suits against Agricultural operations are a problem of state-wide concern that have been addressed by the General Assembly in §5-308 of the Courts and Judicial Proceedings Article (Nuisance suits against agricultural operations). This law uniformity applies to all state courts and confers a limited immunity to agricultural operations.

Based on the above, I believe Worcester County may not amend the common law as proposed.

---

[2]But see County Council v. Investors Funding, 270 Md. 403 (1973) where the Court allowed Montgomery County to alter common law principles under §5(s) of Art. 25A (not applicable to Worcester County code home rule) by creating a county agency with the power to terminate leases, order repairs and award damages. This indicates the Court might allow certain counties limited authority to alter the common law. In McCory, the Court did not follow Investors Funding because it involved remedies "of a much more limited nature" than in McCory. McCory Corp. v. Fowler, 319 Md. 12, 22 (1990).

3

## The Agricultural Reconciliation Committee

Lastly, I believe that Worcester County has the authority to create a local committee to hear nuisance complaints against farm operations. See Article XI-F §1 (code county has broad power to enact a law applicable to organization of the local government); of course, the county cannot create an agency with judicial powers. This would violate the Maryland Constitution; Md. Const., Art. IV, §1 (judicial power vested in enumerated counts); Md. Declaration of Rights, Art. 8 (separation of powers); See Attorney General v. Johnson, 282 Md. 274, 286 (1978) ("essence of judicial power is the final authority to render and enforce a judgment"). There are aspects to the county's proposal that indicate that judicial powers are intended to be granted to the committee; its decisions are called "a final judgment" which "shall be binding on the parties as a matter of law"; There is an indication also that the committee may have independent enforcement powers. (proposal, pp. 4, 7)

Additionally, I do not believe that the county has the authority to grant the reconciliation committee exclusive authority to hear nuisance complaints against farm operations and by-pass the district court. (proposal, p. 7). The district court has jurisdiction to hear tort nuisance actions, depending on the damages claimed, and I do not believe that the county has the authority to authorize appeals to the circuit court from the committee and deny the district court's jurisdiction. See, §4-401 of the Courts and Judicial Proceedings Article (Civil Jurisdiction of the District Court).

I hope that this responds to your request for advice on Worcester County's proposed "right to farm" law. If you have any questions feel free to call me.

Sincerely,

Craig A. Nielsen
Assistant Attorney General

cc: Robert N. McDonald, Chief Counsel
Opinions and Advice

CAN:taj
c:\wpdocs\craig\corresp\hammond.ltr

4

J. Joseph Curran, Jr.
Attorney General

Donna Hill Staton
Deputy Attorney General



Robert A. Zarnoch
Assistant Attorney General
Counsel to the General Assembly

Bonnie A. Kirkland
Kathryn M. Rowe
Sandra J. Cohen
Assistant Attorneys General

# The Attorney General of Maryland
## Office of Counsel to the General Assembly

March 8, 2004

The Honorable Richard F. Colburn
315 James Senate Office Building
Annapolis, Maryland 21401-1991

Dear Senator Colburn:

You have asked for advice as to whether Senate Bill 671, "Dorchester County - Right to Harvest Seafood," violates the Charter Home Rule provisions of the Maryland Constitution. It is my view that it does not.

Senate Bill 671 provides that the County Council for Dorchester County may adopt an ordinance, resolution or regulation, or take any other action that the County Council considers necessary to protect a person's right to harvest seafood. The bill also requires public notice and a hearing before an ordinance, resolution or regulation is adopted under the provisions of the bill. It is my understanding that the bill is aimed at recent instances in which persons have newly moved to the county have objected to traditional seafood harvesting practices as nuisances or as otherwise adversely impacting on their property rights. The bill is intended to permit the County to adopt an ordinance along the lines of those that have been adopted in various counties to protect the right to farm.

Dorchester County has recently adopted a charter under Maryland Constitution Article XI-A, and as a result is a charter home rule county. Article XI-A, section 4 prohibits the General Assembly from enacting a public local law for a charter county "on any subject covered by the express powers granted as above provided." The Express Powers Act, Article 25A § 5 sets out the powers of the charter counties. Among those powers is the ability to pass any ordinance "not inconsistent with the provisions of this article or the laws of the State ... as may be deemed expedient in maintaining the peace, good government, health and welfare of the county." Article 25A, § 5(S). The police power granted by this section is very broad, *Montgomery Citizens League v. Greenhalgh*, 253 Md. 151 (1969), but it is not unlimited. Among the limitations are that a charter county has no authority to legislate with respect to an area that has been preempted by State law. *Steimel v. Board of Election Supervisors*, 278 Md. 1 (1976). Another is that a charter county has no authority to enact a law which, while local in form, affect the interests of the whole state. *McCrory v. Fowler*, 319 Md. 12, 18 (1990).

The Honorable Richard F. Colburn
March 8, 2004
Page 2

The General Assembly has enacted comprehensive legislation on the harvesting of seafood from the waters of the State. As a result, it is arguable that this area of the law is preempted, and not within the express powers. *See* Bill Review Letter on House Bill 1647 of 1984. More importantly, in *McCrory v. Fowler*, 319 Md. 12, 20 (1990) the Court of Appeals held that the creation of a new judicial remedy affected matters of significant interest to the entire state, and could not qualify as a local law within the powers of a charter county. The Court added that the same was true for matters of court procedure, defenses, evidence and elements of a claim. *Id.* at 20-21.

The State "Right to Farm" law creates a defense to nuisance suits and actions alleging that the operation interferes or has interfered with the use or enjoyment of other property for agricultural operations that has been under way for one year or more and is in compliance with applicable laws. Local right to farm provisions contain similar provisions. It is my view that the creation of a defense against these common law actions, like the creation of a cause of action, is not a matter for local laws and is outside the powers granted in the Express Powers Act. Thus, to the extent that Senate Bill 671 would authorize the creation of such a defense, it legislates on a matter that is not within the express powers. It is true that the broad language of the bill would also authorize actions that are within the express powers. However, it does not require any specific action, or attempt to change county law with respect to these matters, so, to that extent, it is simply a statement of existing law and would not be barred by Article XI-A § 4.[1]

Sincerely,

Kathryn M. Rowe
Assistant Attorney General

KMR/kmr
colburn09.wpd

---

[1] Subsection (b) of the bill, which dictates notice and a hearing prior to county adoption of an ordinance, resolution or regulation, could not apply to actions which are already within the County's authority under the Express Powers Act. However, the County Charter, at §§ 303 and 304, requires notice and a hearing prior to the adoption of legislation.

SUE KULLEN
*Legislative District 27B*
Calvert County

———

Chief Deputy Majority Whip

———

Health and Government
Operations Committee

*Vice Chair*
Southern Maryland Delegation

*Chair*
Calvert County Delegation



## The *Maryland* House of *Delegates*
ANNAPOLIS, MARYLAND 21401

*Annapolis Office*
The Maryland House of Delegates
6 Bladen Street, Room 151
Annapolis, Maryland 21401
410-841-3231 · 301-858-3231
*Fax* 410-841-3335 · 301-858-3335
*E-Mail* Sue.Kullen@house.state.md.us

———

*District Office*
P. O. Box 1170
Prince Frederick, Maryland 20678
410-586-9575 · *Fax* 410-586-9576

*2008 – HB 1493*

*Calvert*

April 1, 2008

To:     Chairman Joan Carter Conway
        Members of the Education, Health, & Environmental Affairs Committee
From:   Delegate Sue Kullen

Re:     HB 1493-Calvert County-Authorization to Harvest Seafood and Engage in the Seafood Industry

Dear Colleagues:

Included below are key highlights regarding HB 1493. I respectfully request a favorable vote on this legislation so that Calvert County can work towards restoring its once lucrative seafood industry.

- Calvert County is requesting the authority to issue an ordinance to ensure that the county's watermen are able to use their personal and real property to pursue the quiet conduct of their seafood business in conformance with county and state requirements.
- Calvert County is struggling to maintain its once thriving seafood industry. HB 1493 is being introduced to strengthen the plan established by local government to strengthen the needs of local waterman.
- This ordinance will protect the watermen from nuisance suits brought by newly arrived neighbors.
- Similar ordinances have been enacted in Dorchester, Queen Anne's and Somerset counties.
- This bill is similar to those previously enacted that provide for farmers to pursue the conduct of their agriculture business.
- This bill is supported by Larry Sims, President of the Maryland Waterman's Association, Tommy Zinn and Jack Fringer, Calvert County Waterman's Association, and the Department of Natural Resources.

Sincerely,

Sue Kullen

Delegate Sue Kullen
Beautiful Calvert County